## THE NORTHERN BELLE.

1. It is the duty of the carrier of grain in bulk, in barges on our Western rivers, in the way now usual, as distinguished from the old way in sacks, to see that his barge is capable of resisting, without subjecting the cargo to injury, all the external forces to which it is subjected in the ordinary course of navigation, including especially those incident to the narrow, crooked, and shallow water, and the often changing courses in the currents, of the rivers where they are; and to the force with which the large steamers which have them in tow are often brought against their sides in landing, as they do, for the purposes of their ordinary business, every few miles on the river.

2. The barge must be so tight that the water will not reach the cargo, so strong that these ordinary applications of external force will not spring a leak or sink her, so sound that she will safely carry the cargo in bulk through these ordinary shocks to which she must every day be subjected. If she is capable of this she is seaworthy; if she is not, she is unfit for the navigation of the river. No other test can be given, and this must be determined by the facts in each particular case.

3. It is the duty of the carrier to have his barges often examined and thoroughly inspected so as to be sure of their condition. He should not use a barge after she has become from age or decay or injury unfit for use, and should repair them often and well, so long as they can by repairing be safely used, and no longer. For this he is to be held rigidly responsible.

APPEAL from the Circuit Court for Wisconsin, the case being this:

The La Crosse and Minnesota Steam Packet Company, owners of the steamboat Northern Belle, and engaged in the carrying trade on the Upper Mississippi, undertook to carry for a certain Robson, in their barge Pat Brady, five thousand bushels of wheat from Hastings, in Minnesota, to La Crosse, in Wisconsin, and safely deliver the same, the unavoidable dangers of the river and fire only excepted. On the voyage the barge was sunk and the wheat damaged, and the Home Insurance Company, which had given a policy on the wheat and paid it, filed a libel in admiralty against the steamer and her barge, to recover the loss.

The principal question in issue was the seaworthiness of the barge. The injury occurred May 12th. About the latter part of June following, after another accident and loss

of a cargo on the same barge, she was placed upon the ways for repairs. And the depositions of several witnesses who examined her carefully at this time were now before the court. One of these witnesses testified that he found over ninety timbers rotted and gone, so much so that they were not strong enough to make a fastening to. At one point there were four side timbers rotted out, so as to leave about five feet without support. Her floor-timber ends were much decayed. Another witness stated that on one side he found about fifty rotted timbers, some of them entirely rotted off; on the other side about the same, fifteen or twenty of them rotted entirely off. A third witness, a ship carpenter, confirmed this, testifying that the effect of it would be that any strong pressure against her sides or bottom, from getting aground or surging against a steamboat, would cause her to leak; an inference which it hardly needed a ship carpenter to draw for the court.

The evidence in the immediate case showed that on the occasion when the present catastrophe took place, the steamboat was descending the river in the night, when a slight shock was felt on the barge, so slight that it was not communicated to the boat. It did not stop or retard either the barge or the boat, but in a few minutes the former was found to be sinking, and had to be grounded on the nearest sandbar. No rock or snag was proved to be in the river at the place where the shock first occurred.

The Pat Brady was an old barge which had been formerly called Fort Snelling. But about a year before this catastrophe, she had been repaired and sent forth with a new name.

The District Court decreed in favor of the libellant, and the Circuit Court affirmed that decree. The case was now brought here by the packet company.

*Mr. Cary, for the appellant; Mr. Emmons, contra.*

Mr. Justice MILLER delivered the opinion of the court.

As the decision of the cause turns upon the fitness of the

barge for the purpose of the voyage, or, in the language of the admiralty, on its seaworthiness (a question which, as applicable to the peculiar condition of this navigation, is before us for the first time), we propose to examine into some of the principles on which that question must be decided.

For many years the grain which was transported by steamboats on the Western rivers was first put in sacks, and then placed in the hold of the vessel, or if that was filled, was laid around on the decks. But as this commerce in the cereals increased in importance, including, as it does, the wheat, corn, rye, oats, barley, &c., of that immense agricultural region, it became a necessity to have the freight as cheap as possible. The cost of the sacks in which the grain was carried, and the labor of filling and securing them, and loading and unloading, was a heavy item in transportation. The railroads, which had become active competitors for this carrying trade, did not use sacks, but placed the grain in bulk in cars adapted to the purpose. To facilitate the loading and unloading of grain these railroad companies introduced on their lines, and at the termini of their roads on the rivers, immense buildings called grain elevators. In these buildings the grain was carried by machinery up into bins, and then by its own gravity let down through conductors into the cars, which were thus loaded in a few minutes. The introduction of this mode of loading and carrying grain by the railroads, and the competition which they presented to river transportation, introduced in the latter the use of barges, in which grain was carried in bulk, without sacks, and loaded from elevators, as was done by the railroads. This mode of river transportation, which is often auxiliary to the railroads, has superseded almost entirely the old mode of carrying by sacks in the hold of the vessel, and its present importance and future growth can hardly be over-estimated. It is, therefore, of great consequence to determine, upon sound principles, the rights and liabilities of the carrier and the owner of the cargo in these cases, in regard to these barges, so far as they are open for consideration.

The barges are owned by the same persons who own the

steamboats by which they are propelled, and are generally considered as attached to and making part of the particular boat in connection with which they are used; though quite often an individual or corporation owning several boats, running in a particular trade, have a large number of barges, which are taken in tow by whatever boat of the same line may be found most convenient. In every case, however, the barge is considered as belonging to the boat to which she is attached for the purposes of that voyage.

The question that arises in the case before us has reference to the extent of the duty or obligation which the law imposes upon the owners of such a steamboat in regard to the condition of the barge in which grain is so carried in bulk, as to seaworthiness or fitness to perform the voyage which her owners had undertaken that she should perform safely, with the exception of the unavoidable dangers of the river and of fire.

This duty is one which must obviously belong exclusively to the carrier. He can and must know, at his own peril, the condition of the barge in which he proposes to carry the goods of other people; while the owner of the cargo is under no obligation to look after this matter, and has no means of obtaining any sure information if he should attempt it.

When we come to consider what shall constitute fitness or unfitness for the voyage we must take into account the nature of the service which she is to perform, and the dangers attending the navigation in which she is engaged This is very different in the narrow current and shallow water of the river from what it is in open seas or lakes or their bays and inlets. The necessities of river navigation require steamboats and barges to pass through narrow and crooked channels, and to venture on very shallow water, a water which is constantly varying in its depth, and a channel which often changes its course in a few days very materially. The consequence of this is that both steamboats and barges often get aground temporarily and are soon got off and resume their voyage. Often they rub the bottom of

the river for many feet on crossing a sand-bar at low water, and pass on without injury or interruption. These large steamboats, having a barge or barges in tow, lashed to them loosely, as they must be, are often brought against their sides with much force. They land for the purposes of their ordinary business at every ten or twelve miles of their voyage at the towns and landings on the river, and in doing so must necessarily impinge with more or less force against the barge which is between the boat and the shore. These are the daily and hourly external forces to which the barge is subjected in the ordinary course of navigation.

It is the duty of the carrier to see that his barge is capable of resisting these forces without subjecting the cargo to injury. She must be so tight that the water will not reach the cargo, so strong that these ordinary applications of external force will not spring a leak or sink her, so sound that she will safely carry the cargo in bulk through these ordinary shocks to which she must every day be subjected. If she is capable of this she is seaworthy; if she is not, she is unfit for the navigation of the river. No other test can be given, and this must be determined by the facts in each particular case.

In the one now under consideration, if regard be had to the evidence as to the condition of the Pat Brady, there is not much difficulty. [The learned Justice here recapitulated the testimony as already given as to the condition of the boat.] It is argued by the claimants that the barge struck a sunken rock or snag with such force as to tear open her planks, and that the sinking was one of the unavoidable dangers of the river. But without attempting any nice criticism of that phrase, we are entirely satisfied that there was no shock or force which a strong, well-built barge would not have sustained without injury. The slight character of the shock, the rotten condition of the barge, the additional fact that she was an old barge which had been repaired and had her name changed a year or so before the accident, all prove this. No snag or rock was proved to exist there. It was, in all probability, an ordinary rub over a sand-bar, which the

barge, in her decayed condition, could not stand without leaking.

DECREE AFFIRMED.