## THE LOCKPORT.

(District Court, D. New Jersey. June 10, 1912.)

1. SHIPPING (§ 121*)—CONTRACT OF AFFREIGHTMENT—WARRANTY OF SEA-WORTHINESS.

A warranty in a contract of affreightment that the vessel is tight, staunch, strong, and in every way fitted for the voyage is an absolute warranty of fitness for the service contracted for, both as to the structure and equipment, even against latent defects.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 225, 449-451, 466; Dec. Dig. § 121.*]

2. SHIPPING (§ 132*)—DAMAGE TO CARGO—LIABILITY OF CARRIER.

Under a bill of lading acknowledging the receipt of cargo in good order and condition, and undertaking to deliver it in like order and condition, dangers of the sea only excepted, the burden rests on the carrier to show that damage to the cargo was occasioned by perils for which it was not responsible.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 471-487; Dec. Dig. § 132.*]

3. SHIPPING (§ 132*)—DAMAGE TO CARGO—LIABILITY OF VESSEL—UNSEA-WORTHINESS.

Evidence considered, and *held* to show that damage by water to a cargo of fertilizer, carried by respondent's barge from Baltimore to Salem, N. J., was due to the unseaworthiness of the barge, because of an old crack in the keelson and rotten floor timbers, for the carriage of the cargo shipped, whether the leakage occurred during the voyage, or while lying at the wharf to unload, where she lay on the bottom at low tide, as was customary and expected with vessels of her draft.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 471-487; Dec. Dig. § 132.*]

In Admiralty. Suit by the Fogg & Hires Company against the barge Lockport; Peter Hagan & Co., a corporation, claimant. Decree for libelant.

Howard M. Long, for libelant.

Willard M. Harris, for claimant.

RELLSTAB, District Judge. The barge Lockport was seized and sold in this suit to recover damages to a cargo of fertilizer shipped on it from Baltimore, Md., to Salem, N. J. The answer, by the master on behalf of himself and the owner, admits that a part of the cargo was damaged by water; and the dispute pertains, not to the extent of the damage, but to whether it is due to the unseaworthiness of the barge or the failure of the libelant, in the language of the answer, "to provide a safe berth for said barge to unload."

[1] By the contract between the parties, called a charter party, but in reality a contract of affreightment, the owner of the barge, Peter Hagan & Co., a corporation, warranted that such barge "shall be tight, staunch, strong, and in every way fitted for such voyage." This warranty is one of the most rigid known to the law, both as to structure and equipment—an absolute warranty of fitness, even against latent defects. Hughes on Admiralty, §§ 73, 85; The North-

ern Belle, 76 U. S. 526, 19 L. Ed. 746; The Northern Belle v. Robson, 154 U. S. 571, Append., 14 Sup. Ct. 1166, 19 L. Ed. 748. The test of seaworthiness is whether the vessel is reasonably fit to carry the cargo which she has undertaken to transport. The Silvia, 171 U. S. 462, 19 Sup. Ct. 7, 43 L. Ed. 241; The Southwark, 191 U. S. 1, 24 Sup. Ct. 1, 48 L. Ed. 65.

[2] The bill of lading is in the usual form, acknowledges that the cargo was shipped in good order and condition, and the undertaking is to deliver it in like order and condition—dangers of the sea only excepted. Under the law and such bill of lading, the burden is upon the carrier to show that the damage was occasioned by perils for which it was not responsible (Clark v. Barnwell, 53 U. S. 272, 13 L. Ed. 985; The Folmina, 212 U. S. 354, 29 Sup. Ct. 363, 53 L. Ed. 546, 15 Ann. Cas. 748), and, in view of the contentions of respondent in this case, that it was due to the failure of libelant to furnish a proper and safe berth at the place of destination.

[3] The barge left Baltimore on or about March 12, 1910, and arrived at Salem in the afternoon of the 15th. Nothing unusual in her appearance was then noted by libelant. The next morning, however, she was discovered to be hogged and twisted—stern down on port side and bow up on starboard side—and that she had taken in considerable water. On pumping, the water showed a yellow or walnut discoloration, indicating that it had reached the fertilizer. The unloading of the cargo began early the second day, and continued with reasonable dispatch until it was discharged. The fertilizer was carried in bags, and no wet or damaged cargo was discovered until the bottom layers were reached. While the first day's unloading, near its close, revealed that some of the cargo was injured by water, the full extent of the damage was not ascertained until the following day. Of the cargo of 430 tons, about 169 tons, being that contained in the bags forming the bottom tiers, was damaged, of which 109 tons was so badly damaged as to require re-treating by chemicals. The testimony fixes the libelant's damage at $1,961.57. The water which caused the damage came through the bottom of the barge, about amidships.

The barge was bought by the present owner after it had been in service as a grain-carrying barge for a number of years, a service which tends to shorten the life of the barge for carrying perishable freight. The present cargo was of greater tonnage than had been carried by such barge during its present ownership, and the barge dragged the bottom of the canal between the Chesapeake Bay and the Delaware river, and stirred up the mud in Salem creek at high water. The only person who testified concerning the voyage from Baltimore to the Delaware river was the captain, and he, while testifying to having had a rough voyage on account of a heavy storm in the Chesapeake Bay, says that no greater leakage occurred on such voyage than is usual with a good, staunch vessel, and that the cargo was not damaged until after it had reached the Salem wharf. But this testimony is so radically different from his statement made under oath a few days after the damaged cargo was discovered, in which he clearly and positively declared that the barge was unseaworthy for the cargo

then being carried, and that a great leakage took place on such voyage, that even if such sworn statement. in view of such testimony, cannot be accepted as plenary proof of the facts of such voyage, it clearly discredits him, and compels the court to disregard entirely his version of the occurrences on such voyage. The testimony of the captain and master of the tug Delaware, which took the barge from the Delaware river end of such canal to Salem, that little water was in the barge on its trip across the Delaware river to and up Salem creek, while tending to establish that no great leakage was then taking place, does not prove that no previous great leakage had taken place, nor overcome the preponderating weight of the other testimony. that the barge was unseaworthy.

After the barge was sufficiently unloaded to locate the leakage, an examination revealed a crack in the keelson, opening about two inches, in which were found lumps of coal. As coal was not a part of that cargo, it is evident that the crack existed before this trip began, and that it was due to strains encountered on some previous voyage. A more extended examination, made subsequent to the removal of the barge to the owner's yard, where she was hauled out for repairs, revealed that between the forward end of the forward hatch and some distance aft of the after hatch a large number of floor timbers, then exposed to view preparatory to making repairs, were very much decayed. How many and how much of each were decayed is in dispute, but the evidence convinces that the decay had progressed to such an extent as to weaken the framework of the barge and unfit her for the carrying of a perishable cargo of the dead weight of the fertilizers in question.

In the facts of this case, the inference is justified that the cargo was damaged because of the unseaworthiness of the barge, due to the rotten floor timbers, beams, etc., and the old crack in the keelson, unless the other evidence in the case shows that the berth given to this barge at the Salem wharf was not safe and proper for a seaworthy vessel to lie in, and that the bad bottom of such wharf was the primary and efficient cause for the leakage which damaged the cargo.

At no public wharf in Salem, nor at any other place where this barge could have been unloaded, was there sufficient water at low tide to float her while drawing the depth of water drawn on that trip. There is a dispute as to the character of the bottom of the creek, and whether it was even where the barge was moored. The evidence is satisfying, however, that the bottom was of soft mud and sand, mostly the former, that it was comparatively level where the barge lay, and that a barge would safely make her bed in the mud bottom when she settled down with the ebbing tide. Other loaded barges drawing a like depth of water lay there before and after without mishap. It is customary and necessary in this creek, and like waters, for barges and other boats to rest on the bottom at low tide, which is a well-recognized condition of such service, and they are expected and required, in order to be seaworthy, to be sufficiently staunch and strong to main-

tain their integrity when so caught with cargo. The Northern Belle, 76 U. S. 526, 19 L. Ed. 746.

Even if no part of the cargo was damaged before it arrived at Salem, the burden of proving which was on the respondent, and which it has not met, and such damage was due to the bottom of the barge giving way under the strain produced by lying on the bottom of the creek at the first low tide it encountered there, such collapse was not due to the character of the bottom, but to the inability of the boat, by reason of its cracked keelson and rotten floor timbers, etc., to withstand the strain that began when the barge settled down on the creek bottom. The creek bottom was not the cause of the collapse, but was the condition upon which the primary cause—unseaworthy barge —operated. The latter was the primary and efficient cause, and is one that is chargeable to respondent.

The libelant is entitled to a decree for the sum of $1,700.57, being $1,961.57 damages sustained, less $261 for freight due on undamaged cargo, besides costs.