### THE MALCOLM BAXTER, JR.

### FRENCH OVERSEAS CORPORATION v. REPUBLIC OF FRANCE et al.

District Court, S. D. New York.
Oct. 6, 1921.

Harrington, Bigham & Englar, of New York City (T. Catessby Jones and Vine H. Smith, both of New York City, of counsel), for petitioner.

Harry M. Zuckert and Rumsey & Morgan, all of New York City (Mark W. Maclay, of New York City), for Compagnie Franco-Indo-Chinoise and Engineering Timber Co.

Kirlin, Woolsey, Campbell, Hickox & Keating, of New York City (Robert S. Erskine and Carleton L. Marsh, both of New York City, of counsel), for the French Republic.

KNOX, District Judge.

Petitioner was the owner of the wooden four-masted schooner Malcolm Baxter, Jr., which upon August 16, 1917, sailed from New Orleans for Bordeaux, France.

Claimants were the shippers of certain cargo loaded on board the vessel, and such shipments were carried under bills of lading which contained a clause reading as follows: "Also that freight prepaid will not be returned goods lost or not lost. Prepaid freight is to be considered as earned in shipment of goods and is to be retained by vessel's owner, vessel or cargo lost or not lost, or if there be a forced interruption or abandonment of the voyage at a port of distress or elsewhere. * * *"

In addition to this, there was the usual clause exempting the vessel from restraints of princes, rulers, and peoples.

While en route to Bordeaux the Baxter developed leaks which caused her master to put in at Key West. There she was surveyed and repairs were recommended, the vessel being towed to Havana therefor. Prior to the completion of the repairs, the United States Export Administrative Board put into effect its ruling of September 28, 1917, that sailing vessels would not be permitted to clear for points beyond the war zone. This ruling remained in force, and the Baxter, not procuring a clearance, took her cargo on board and proceeded to New York, where it was surrendered to claimants. It was then found that parts of claimants' shipments were damaged and missing. Some of this damage had occurred upon the trip from New Orleans to Havana.

Thereupon libels for cargo and other damage, and for recovery of prepaid freight, were filed against the Baxter. Her owner then petitioned for exoneration and, should that be denied, for a limitation of liability. The petition has been answered by the orig-

inal libelants with allegations substantially similar to those set forth in the libels.

The principal questions presented for determination would appear to be:

1. Was the Baxter seaworthy when she left New Orleans;

2. If, not, is petitioner entitled to limitation; and

3. What was the real and sufficient cause of the termination of the voyage and the frustration of the adventure?

First, as to seaworthiness:

The ship was built in 1900; had a length of two hundred twenty-six feet, a forty-five foot beam, and a depth in the holds of twenty-one feet.

Prior to 1916 the vessel, which enjoyed a rating of A–1, American Bureau of Shipping, had seen some service in the coal trade, and had developed a four-foot camber, or hog, in her keel. A camber, it was said upon the trial, "has a tendency to push up, to weaken the bottom, to weaken the bilges. * * *" In the case of the Baxter it had also affected the contour of her deck.

It is true that a camber is present in most wooden vessels of substantial size. It is none the less true that such development weakens the structure of the vessel wherein it occurs.

In the fall of 1916 the class of the Baxter being suspended, she was submitted for repairs as recommended by a surveyor of the American Bureau. Apparently the repairs were designed not only to make good the ravages of ordinary wear and tear, but were also intended to overcome, as far as possible, such structural weakness as had developed. To this end, a new deck stringer, sister keelsons, turn buckles, pointers, transverse bracing, and several thousand bolts were placed in her hull. This being done, the vessel was restored to her former classification.

She was then chartered, and loaded with a cargo for Rotterdam. Owing to the inability of the charterer to procure a necessary permit, the voyage was abandoned and the cargo discharged. Following this, she was chartered to carry coal to Havana, and, having done so, proceeded to New Orleans to undertake the voyage in question.

Loading her cargo and having in the meanwhile passed to the ownership of petitioner, the boat cleared for Bordeaux. She was towed down the Mississippi to Port Eads, and, for some unexplained reason, lay there until August 23, when she put to sea. Before departing, however, she was found to

have a steady leak near the juncture of her stem and the ends of the planking. Loveland, the master, was made aware of this development, but despite the fact that he then believed his ship to be unseaworthy for an overseas voyage, he hoisted sail and got under way.

What happened in the next few days has an important bearing on the question of seaworthiness, but, as is not infrequently true in cases of this character, the ship's log is missing, and has not been satisfactorily accounted for. As to what actually transpired I am forced to rely upon the master's protest as made at Key West, and upon testimony given years after the event and when, perhaps, some of it is colored by friction which has arisen between the master and the vessel's owners.

Save for the presence of a ground swell and the continuance of the boat to take in water, nothing much occurred prior to August 26. On the morning of that day the vessel was found to have thirty-three inches of water. Pumps were started and continued to operate until the water had been reduced to fifteen inches, at which time the after pump broke down. Repairs were effected and the pump put into commission at 3 p. m. The vessel then had thirty-eight inches of water with "an apparent bad leak." The barometer began to fall, and the weather turned bad. A heavy swell was running, and more water began to enter the ship. She was pumped at 5 o'clock, again at 7:30 p. m., and at intervals through the night. The next and succeeding days were much the same, with the exception that on August 29 the fresh-water tank sprung a leak. With no substantial change in conditions it was decided to put in at Key West. This was done upon September 1. Survey was held four days later. Two leaks, together sufficient to admit three and one-half inches of water per hour, were found in the neighborhood of the stem, and the surveyors were not sure that other leaks did not exist. The cabin doors were jammed; the vessel had a considerable list to port, and was somewhat by the stern. The surveyors recommended the restowage of cargo and, not being certain of the vessel's seaworthiness to proceed to France, that repairs be made.

For this purpose the boat was towed to Havana and discharged. Again she underwent extensive repairs of a structural nature. Upon their completion in January, 1918, the vessel was inspected and pronounced seaworthy. A new master having supplanted Loveland, he went to the office of the American Consul in Havana to sign on new members of the crew, and learned of the embargo that had been placed on wooden ships. The ship, therefore, when ready to depart, left for New York.

In the course of that trip she encountered a storm of considerable severity, and once more she began to leak, taking in as much as three feet of water in twelve hours. On January 25 the leakage in the forward part of the vessel amounted to seven inches per hour. During the voyage one of the main pumps broke down. Repairs were made, but the necessity that the pumps should remain in operation is indicated by the fact that upon the day of the Baxter's arrival in New York she took in twenty-six inches of water in one hour.

During the storm referred to, the vessel shipped green water across her deck, and lost some sail in the wind, but that the storm was at all catastrophic, or even unusual in its severity, I incline to doubt. One must remember that a January voyage along the Atlantic Coast is quite apt to be marked with rough weather.

Some point is made by petitioner of the fact that the existence of the camber in the keel of the Baxter makes unreliable the estimates of the amount of water entering the hull; that is, the vessel being by the stern, the water in the forward well would, after a time, drain to the after well; and that the various stages of water should not be construed as extending over the entire bottom of the ship. Granting this to be true, it should be recalled that when one day out of New York seven inches of water per hour came in at the forward end of the vessel. While Captain Hupper said he was not anxious about the safety of the ship, I have little doubt that he was glad, as was Captain Loveland at Key West, to get into port.

After giving consideration to this argument and to all the evidence in the case, I have reached the conclusion that the Baxter was unseaworthy when she left New Orleans.

The cumulative effect of the testimony relating to the successive repairs made upon the boat, the similarity of her performance when she had sailed from New Orleans, and again from Havana, is most persuasive. There is, too, the implied admission of Captain Proctor, of the American Bureau of Shipping, and the emphatic declaration of Captain Bagger, that at the time of her launching the ship was not well constructed. Add to this the evidence that in the course of her previous service the Baxter had been sub-

jected to some abuse, and had developed a camber of more than ordinary size, and which must have broken some of her timbers, and I have little doubt that she was so inherently weak in her original structure, and had been so strained in her subsequent service, that the repairs lavished upon her, first at Hoboken and then at Havana, did not serve materially to strengthen and improve her condition.

Giving a moment's consideration to petitioner's suggestion that the putting in at Key West was not due to any unseaworthiness of the Baxter, but may have resulted from Captain Loveland's dislike to go through the submarine zone, it is my opinion that if such theory be accepted it would go far towards establishing claimants' case. If, being confronted with no maritime necessity and bringing about a deviation not in the exercise of proper skill and judgment, but solely to serve the dictates of a cowardly nature, or having received a bonus for the dangerous task he had set out upon, he sought to retain it without undergoing the risk for which it was the pay, there could be, as I see it, no possible justification for the results of his wrong to be inflicted upon claimants.

■ As to petitioner's right to limit liability, the material facts, as I view them, are:

A man named Sickler (afterwards an officer of petitioner), and who negotiated the sale of the Baxter to petitioner, was at New Orleans shortly after the boat arrived there. To him was committed the responsibility for ascertaining her condition. He, not being a practical man, delegated Gage, also not a practical man, to conduct such investigations as should be made.

The contract for the purchase of the Baxter bears day of the blank day of June, 1917. The bill of sale is dated July 21, 1917. Upon July 25, a surveyor (now deceased) of the New Orleans Board of Underwriters issued to the charterers or former owners a certificate wherein it was stated that the vessel " * * * has completed her loading of general cargo * * * under this inspection, and has conformed to all the rules of the New Orleans Board of Underwriters in relation thereto. She is now properly laden to proceed on her voyage to French port. * * *" Gage, it is true, employed this inspector for the task performed. He does not know, however, as to the extent of the examination made. He recalls only that the certificate was handed to him, and that he obtained it for the primary purpose of starting the running of the vessel's lay days. There is no proof of the surveyor's qualifications.

Captain Thomsen, another surveyor, also looked over the vessel, but, as he admits, his examination was more or less superficial. So much so was this the fact that he did not know of the existing camber. Gage is not certain whom it was that Thomsen represented. He thinks it was both the former owners and petitioner "because he came to the vessel in connection with the sale and evidently must have represented them."

When Loveland took command he told Sickler and Gage that the boat was too much by the stern. At the time of Thomsen's examination and that of Loveland the vessel was perhaps half or three-fourths loaded.

The president of petitioner, whose chief interest, he says, was that the purchase of the boat "should be a good piece of business," relied upon the vice president Carpenter to ascertain the vessel's condition. Carpenter, in turn, relied upon the vessel's rating more than upon anything else, and himself never saw the vessel.

Under petitioner's contract it was provided that the schooner have " * * * a rating of Class A–1" and that she "should be in as good and efficient state and condition as at the present time." There was, however, no covenant that the boat should in fact be seaworthy, nor was there anything to that effect in the bill of sale, notwithstanding that the vessel had just come from a voyage in the coal trade, and had not been reinspected by the classification bureau.

The vessel was light when she arrived at New Orleans, and while in that condition she might have been inspected; yet Sickler did not go to New Orleans until August 1, and after loading had begun. He says that no complaint of the vessel's condition was made to him by the charterers, nor by stevedores, shippers, or any one else; but in the absence of complaints, together with what of an affirmative character appears to have been done, is there sufficient to absolve petitioner?

It seems to me that there was in this case a lack of appreciation upon the part of petitioner of the obligation which it, as an owner of shipping facilities, was under to the persons whose goods it should undertake to transport.

The owner here did not, as was said in The Tommy (C. C. A.) 151 F. 570, 573, should be done, provide a suitable person or persons as its agent to inspect the vessel. Certain it is that the standard of due diligence set up in The Julia Luckenbach (C. C. A.) 235 F. 388, was not observed. As to the possible suggestion that the defects of the

Baxter, even had she been examined when light, would not have been disclosed, I am of opinion that it is not necessary to speculate upon this point. The leak developed before the Baxter was called upon to do more than be towed to Port Eads. While lying there her captain wrote his owners that they need not be surprised if he turned up in a gulf port. When the vessel reached Key West, there was no difficulty in locating her trouble, and I think the chances are good that the defects would have been found at New Orleans had any one cared enough to look for them. The petition to limit liability will be denied.

Before proceeding to take up the question as to whether the unseaworthiness of the Baxter, or the embargo placed upon sailing vessels, brought about the abandonment and frustration of the voyage, it is necessary to deal with Claimants' contention that the Baxter made no effort to obtain a clearance from Havana to Bordeaux. It is said that in certain instances sailing vessels were permitted to clear for points beyond the war zone, and that, inasmuch as a part of the Baxter's cargo was for the French Republic, there is reason to suppose that she too, might have been permitted to go forward, assuming her fitness to do so. There is, however, no proof that exceptions were granted by the government, or that one would have been granted in this instance.

Captain Creighton was told by the United States Consul in Havana that if clearance for Bordeaux were applied for it would be refused. In the absence of any proof other than that now in the record, I shall assume that the embargo was rigidly applied and that the ship would not have been permitted to go on her way.

■ Coming now to the frustration of the adventure and the responsibility therefor, one is confronted with the "restraint of princes" clause and that relating to prepaid freight as contained in the bills of lading. The comprehensive nature and binding effect of such clauses, upon the intervention of a governmental embargo, is illustrated by such cases as Allanwilde Transport Co. v. Vacuum Oil Co., 248 U. S. 377, 39 S. Ct. 147, 63 L. Ed. 312, 3 A. L. R. 15, and International Paper Co. v. Gracie D. Chambers, 248 U. S. 387, 39 S. Ct. 149, 63 L. Ed. 318. In those cases, however, there was no finding that the vessels concerned were unseaworthy for their contemplated voyages. Each ship fulfilled its warranty of fitness; there was no default over which either ship or its owners had any

control; and, as a result of these circumstances and the presence of appropriate exceptions in the bills of lading, the ships were adjudged to be entitled to retain the freight money.

Here, the facts are materially different. At no time prior to September 28, 1917, the date upon which the governmental embargo went into effect, was the Baxter ready, able, and willing to perform her contract. She failed in the performance of her warranty of seaworthiness, and that warranty was the basis upon which the present claimants parted with their freight money. That such warranty existed there can be no doubt. The Edwin I. Morrison, 153 U. S. 199, 14 S. Ct. 823, 38 L. Ed. 688; The Caledonia, 157 U. S. 124, 15 S. Ct. 537, 39 L. Ed. 644; The Lockport (D. C.) 197 F. 213; Benner Line v. Pendleton (C. C. A.) 217 F. 497.

In my opinion it was of the essence of the present contracts of affreightment that the Baxter was, when the contracts were made, able to perform her undertaking. It was not the agreement that the vessel should *thereafter* become able to go forward. If such were the case the effect would be that claimants assumed all the risk incident to petitioners' efforts to make good its contract. This, I think, claimants were not called upon to do.

Having found the breach of warranty as to seaworthiness to have been an effective and continuing cause of frustration, there is no reason, that I can see, why petitioners should be relieved of liability merely because an additional cause of frustration intervened. The last cause was only incidental to the first.

From what has been said, petitioners' breach of contract will be regarded as the sufficient cause of frustration. It follows that claimants should recover such damages as are attributable to the breach. Among these is the amount of freight paid for a service which petitioners did not and could not render.

In reaching this conclusion I am not unmindful of the earnest and able argument of petitioner's advocate to the effect that the result should be different in view of the decision of the Court of Appeals for this Circuit in The Thessaloniki, 267 F. 67, and the holding of the House of Lords in Kish v. Taylor, 81 L. J. K. B. 1027. I do not understand, however, that in The Thessaloniki there was any finding that the vessel was so unseaworthy as to be unable to perform its contract under any circumstances. And even though it should be conceded that Kish v.

Taylor supports the contention of petitioner, I am unwilling, in the absence of a definite holding to similar effect by an authoritative court of this country, to follow that case.

A decree in conformity herewith may be submitted.