**O. F. NELSON & CO., Limited, v.
UNITED STATES.**

No. 10816.

Circuit Court of Appeals, Ninth Circuit.

May 21, 1945.

Farnham P. Griffiths, Charles E. Finney, and McCutchen, Thomas, Matthew, Griffiths & Greene, all of San Francisco, Cal., and Bigham, Englar, Jones & Houston, of New York City, for appellants.

Frank J. Hennessy, U. S. Atty., and Esther B. Phillips, Asst. U. S. Atty., both of San Francisco, Cal., and Arnold Knauth, Atty., Department of Justice, of Washington, D. C., for appellee.

Before DENMAN, HEALY, and BONE, Circuit Judges.

DENMAN, Circuit Judge.

This is an appeal from a decree in admiralty holding the appellee is not liable for injury to and loss of appellants' cocoa beans while being transported by the appellee on or about January 29, 1942, in the harbor of Pago Pago of the Samoan Island of Tutuila, on appellee's Navy's wooden lighter, from appellee's Customs warehouse to the steamer Jupiter.

The cocoa beans were an import from British Samoa and held for transshipment to California where they would again enter the Customs' custody. It was admitted that the beans were held in the Customs warehouse not as a favor extended by the Navy but under the law of the United States requiring it to collect the import tariff on them or confine them until transported to another port of entry. While in the custody of the United States it collected a warehouse charge, also imposed by law.

The Jupiter was operated for the appellee and as appellee's agent and as such was to carry the cocoa beans under commercial bills of lading, previously prepared under appellee's direction, to the port of entry at San Francisco, California.

The burden was upon the appellants to sustain their contention that appellee's carriage was as a common car-

rier. Since they have failed to make such proof, we hold that appellee carried the cocoa beans as a private carrier and that the burden of proof is upon appellants to show appellee's violation of its obligation as such carrier. However, certain inferences and legal conclusions are to be drawn from the following facts:

█ (1) That the cocoa beans were in the possession of the appellee in the Customs warehouse of appellee awaiting export, for which the owners of the beans were obligated to the appellee to pay a warehouse charge. Appellee, bailee, was therefore under an obligation to appellants to exercise its best efforts to protect the beans from loss or damage in the war emergency hereafter discussed.

(2) It is admitted that the cocoa beans were in good condition at the time the appellee, as a private carrier bailee, received them from the shippers and that the injury to them occurred while in the carrier's possession during their carriage.

(3) It is admitted that the lighter in which the beans were carried was unseaworthy and that the unseaworthiness was the physical cause of the loss.

█ (4) While there was no express warranty of seaworthiness of the lighter, there is always an implied warranty of the carrier that the vessel in which the carriage is to be made is seaworthy—an obligation as much on a private carrier as on a common carrier. Commercial Molasses Corporation v. New York Barge Corporation, 314 U.S. 104, 110, 62 S.Ct. 156, 86 L.Ed. 89.

We hence approach this case with the facts showing that the loss of the cocoa beans arose from an admitted breach of the warranty of seaworthiness. To this appellee's contention is that it was excused from inspecting the hull of the lighter to discover her unseaworthiness because of the circumstances arising from the war with Japan and the reasonable military apprehension that the Japanese fleet would attack the Samoan Islands and particularly the harbor of Pago Pago during the period in which the cocoa beans were being transported in the lighter—a defense which under an ordinary bill of lading is provided in the usual clause excepting loss from "The Act of God, enemies, pirate, robbers or thieves, by land or sea, arrests or restraints of princes, rulers or people, * * *."

█ All the testimony as to the occurrences causing the damages sued for is by deposition. The Samoan Islands were and are under military control and the appellants were unable to produce any witnesses of the facts leading to the admitted loss of the cocoa beans. Appellee cargo carrier recognized that appellants' cargo so was in its possession as a merchant carrier under the prepared bills of lading and that the court could draw all relevant inferences of fact adverse to it that could be drawn from the failure to produce evidence of the relevant happenings at Pago Pago so within its sole control. The law is summarized in Commercial Molasses Corporation v. New York Barge Corporation, supra, 314 U.S. 110, 111, 62 S.Ct. 161, 86 L.Ed. 89, as follows:

"The burden of proof in a litigation, wherever the law has placed it, does not shift with the evidence, and in determining whether petitioner has sustained the burden the question often is, as in this case, what inferences of fact he may summon to his aid. In answering it in this, as in others where breach of duty is the issue, the law takes into account the relative opportunity of the parties to know the fact in issue and to account for the loss which it is alleged is due to the breach. Since the bailee in general is in a better position than the bailor to know the cause of the loss and to show that it was one not involving the bailee's liability, the law lays on him the duty to come forward with the information available to him. The Northern Belle, 9 Wall. 526, 529, 19 L.Ed. 746; Gulf, C. & S. F. Ry. Co. v. Ellis, 8 Cir., 54 F. 481, 483; Pacific Coast S.S. Co. v. Bancroft-Whitney Co., 9 Cir., 94 F. 180; The Nordhvalen, supra, 6 F.2d [883] at page 886. If the bailee fails it leaves the trier of fact free to draw an inference unfavorable to him upon the bailor's establishing the unexplained failure to deliver the goods safely. Southern Ry. Co. v. Prescott, supra [240 U.S. 632, 640, 36 S.Ct. 469, 60 L.Ed. 836]; cf. The America, D.C., 174 F. 724."

To sustain its obligation so to go forward with the facts showing its absence of fault in the loss of the cargo, appellee has produced the depositions of two witnesses. At the hearing of the appeal, appellee supplemented its testimony with two frank admissions of fact to us, of which the findings and opinion below show no evidence that they were made at the district

court hearing. These admissions, later considered, are valuable to the appellants and which it would be an injustice to them for us to ignore.

The only other witness is a ship loading expert produced by appellants, whose uncontradicted testimony concerned the simple calculations of the carrying capacity of the lighter whose dimensions were given by appellee's witnesses. Appellants produced no witness with personal knowledge as to the condition of the lighter when it began its loading of the cocoa beans or of the happenings leading to their loss. This, although the testimony shows the lighter just prior to the loading was in the possession of an unnamed naval officer and that one of the boss stevedores was the native governor of Tutuila and another a native of unusual intelligence. All the persons controlling the lighter were under the higher commanding Naval officer in charge of the discharge and ballasting and loading of the fleet of several vessels arriving at Pago Pago, of which the Jupiter was one.

■ The admissions at the hearing of this appeal, above referred to, are (1) that the sacks of cocoa beans, as bill of lading cargo to be placed in the Jupiter's after hold, were also desired there to aid the ballasting of the Jupiter—that is to aid the trim of the ship by bringing her stern down,[1] and (2) that the distance from the point on the wharf where the lighter was loaded was not over 300 feet from the No. 5 after hold of the Jupiter, alongside which the lighter was to lie in discharging her sacks of cocoa beans. This although appellee's scaled drawing of the warehouse and the Jupiter shows the distance could have been somewhat greater.

■ In this situation this admiralty appeal is before us under the rule of this circuit stated in The Ernest H. Meyer, 9 Cir., 84 F.2d 496, 501:

" * * * In such a case, and where all or substantially all of the evidence pertinent to the finding is given by deposition, the presumption [of its validity] is of lesser weight and more easily may be rebutted. The Natal, 9 Cir., 14 F.2d 382, 384: 'The rule that findings of fact are entitled to great weight in an appellate court is modified where, as here, they are based wholly upon depositions.' "

■ In this connection the district court's opinion and findings and conclusions of law give no consideration (1) to the inferences necessarily to be drawn from the failure to produce the evidence of the commander of the port, who had overall charge of the planning, inspection and use of the lighter facilities of the port, responsible for their inspection, or of any person under him, prior to the arrival of the Jupiter and the other vessels. As to these lighters there was, *first,* appellee's *naval* obligation to inspect them before the arrival of the vessels to insure their safe discharge and, *second,* appellee's carrier's obligation to inspect for the seaworthiness of the lighter to carry the cocoa beans safely to the Jupiter for her ballast and cargo. Nor (2) did they consider the fact that the admitted unseaworthiness of the lighter causing the loss violated the appellee's warranty as a private carrier. Nor (3) did they consider the jurisdiction of the court over the appellee's sovereign

---

[1] The principle underlying the statement of the dissent that a proctor, in an appellate court, may not admit such a fact as that concerning the purposed action of his client in Tutuila, Samoan Islands, in ballasting the Jupiter, because he was not there and hence could not make the statement of his own knowledge, would make incompetent every admission of fact by any proctor concerning his client's case. If this be true, it is novel doctrine in what is, in effect, a trial de novo in an admiralty appeal. We regard the admission of and statement of fact by a litigant through his proctor in the hearing of an admiralty appeal, exactly as if made by him before the court of first instance in the hearing there.

Since the record does not disclose the confidential files of the appellee government for the preparation of the defense of the case, and since, presumably, they were in the possession of the appellee's proctor, we have not the prescience to state that they contain nothing concerning the appellee's purpose to ballast the freighter.

In admitting the purpose to ballast, the proctor did not state that he merely inferred it from the evidence. However, had he done no more than to admit the inference, and then based on it an argument favorable to his client, his opponent and the court properly could accept the admission, though drawing a different inference from that of the admitting proctor and adverse to his client's case.

person to adjudicate the appellants' claim against it, a question which underlies all that was done by that court.

All damage to and loss of this cargo occurred through the unseaworthiness of appellee's lighter due to her seams opening through exposure to the sun of her wooden sides below her load line. Lieutenant Commander Crumpacker frankly admitted that later, when the lighter's submergence had caused her wooden side boards to swell and she was watertight, she safely carried loads equivalent to the 1586 bags stowed on her when she overturned.

The island of Tutuila and its harbor Pago Pago had for several years been under the government of the Navy Department. Within a month after Pearl Harbor, December 7, 1941, the island had been shelled by a Japanese submarine and the movement of the Japanese for the conquest of the South Pacific islands was well under way. It was obvious that that island and port must be reinforced to resist a likely Japanese invasion.

On January 6, 1942, the Jupiter and other accompanying vessels in the Navy's service left the California coast with soldiers and 35,000 tons of their arms, equipment and supplies on a 14-day voyage to Pago Pago. It is common sense and a proper inference in the absence of appellee's testimony that the Naval officer in command of the island was wirelessed of the departure of these vessels and of their arrival on or about 20th of January for their discharge at Pago Pago.

Appellee admits that the island's commanding officer knew he was hard pressed to find housing for the 35,000 tons of munitions and supplies of the approaching vessels. It also must have been obvious that the Customs' warehouse would have to be emptied of its private commercial goods, held there by appellee as bailee under the Customs laws, such as appellants' cocoa beans which had been stored there since the preceding November.

In a global war all foods, but particularly chocolate, the product of the cocoa bean, with its pleasant taste and dietary excellence to the armed forces, have great value. It also was obvious that a Japanese conquest of the South Sea Islands would deprive the armed forces of this source of supply of chocolate. That the commanding officer recognized this is apparent from the

efforts later made to salvage them. Under Navy orders, the bags, which the lighter in overturning dumped off her deck, were brought ashore by native labor. They then were carried to the Ontario tennis court to be opened and dried. By the time labor was available for spreading the beans in the sun they were spoiled by the salt water.

Long before the arrival of the merchant ships, the beans could have been removed to this nearby Ontario tennis court and there covered with canvas. They there could have been piled, as later on the lighter, where they were 9 tiers high and covered an area not greater than the 25 x 40 feet of the lighter's deck. In that condition the outer tiers would have protected the inner bags against moisture of the heavy tropical rains of that season of the year. If this was the best the commanding officer could do for them, the appellee would have discharged its obligation of "due care" as an United States Customs warehouse bailee to the bailor appellants.[2] There is no showing that there were not time, labor and materials for such a disposition of the cocoa beans in the two weeks prior to the arrival of the vessels.

The commanding officer chose another method of discharging appellee's bailee obligation as a Customs warehouseman and saving the beans for their ultimate use in war time. He left the 100 tons of bags in the warehouse to be carried with other cargo, all aggregating 150 tons, by one of the departing merchant ships of the approaching convoy. In so discharging that obligation the commanding officer also would be discharging the Naval function of supplying ballast to one of his outgoing vessels—one of the admitted purposes in making this disposition of the beans.

Another Naval duty of the commanding officer was the preparation of his port facilities for the discharge of the vessels to arrive some two weeks later. These were limited to one wharf, 300 feet long, at which but one vessel could be discharged at a time, and three lighters owned by the Navy, one the lighter in question here, to be used for discharge of the merchant ships at anchor in the harbor.

▆▆▆ Again it is not necessary to invoke the inference from the absence of evidence. It is obvious again that the emergency required the utmost care in the

---

2 Commercial Molasses Corporation v. New York Barge Corporation, supra, 314 U.S. at page 110, 62 S.Ct. 156, 86 L.Ed. 89.

inspection of the lighters to determine their seaworthiness for the carriage of war time cargo from the vessels then on the way from California and to load and ballast them for their return voyage. So far as concerns the lighter which later carried the cocoa beans, the evidence and absence of evidence (Commercial Molasses Corporation v. New York Barge Corporation, supra) requires the inference that she was not inspected at all.

The commanding officer detailed to two subordinates the duty of discharging the vessels and loading them for the return voyage. An unnamed lieutenant commander directed the discharge. Another lieutenant commander, the witness Crumpacker had charge of the outloading and ballasting. The unnamed officer, not produced as a witness, had in his control the three lighters. Crumpacker knew nothing of the condition of the lighter loaded with the beans until after she was overturned.

Above the lighter's unloaded water line there was a freeboard of 6 feet to her full load line. It is admitted that she had been unloaded and exposed for some time to the tropical sun and her wooden side seams had opened so that her actual freeboard up to the seam openings was under her load line. That is to say, that a normal load would cause water to enter her hold through the open seams. The water so admitted in fact submerged her that when she overturned the few bags sticking on her deck were also submerged.

It is obvious also that a few minutes' inspection of the 25 x 40 feet sides of the lighter's wooden hull would have disclosed her unseaworthy condition as to her sun-opened seams—that is, a few minutes in the minimum time of 23 days from the departure of the convoy from California on January 6th to the loading of the lighter on January 29th. As stated, in the absence of the unnamed commander and his subordinate and of all other witnesses of the lighter's condition in that period, we are required to infer that she had not been inspected.

Here was outstanding negligence in the discharge of appellee's Naval duty to resist the enemy in discharging and in loading and ballasting the convoy and of the carrier's duty to appellants. The performance of the Naval duty which is the claimed excuse for the loss of the cocoa beans is thus seen to be infected with

negligence at the moment the carrier's obligation attached.

The unnamed lieutenant commander delivered the lighter to Crumpacker's boss stevedores at the wharf of the Customs warehouse at 10 o'clock on the night of January 29th. Crumpacker was not there. It is peculiarly within the knowledge of appellee whether the boss stevedores were advised of the open seams of the lighter when they received her. Since there is no evidence on this subject, we may infer they were not. Indeed, the evidence of her loading compels the inference that they did not know the lighter had not been inspected and that her open seams made certain her subsequent submergence.

The loading of the beans was directed by Crumpacker's experienced boss stevedores. On the assumption that the lighter's sides were water tight, they and their stevedores piled the 175 pound bags in 9 tiers, expecting that in the quiet waters of the harbor she would carry such a load safely the short 300 feet to the Jupiter's No. 5 hold, where they could supervise the unloading. As stated, Crumpacker testified that later, when the lighter's submergence had swelled her seams, she successfully carried such loads in the waters of the bay.

There were 100 natives experienced in piling bags on vessels. However, it is a matter of indifference whether these or other inexperienced men piled them. We must assume, in the absence of any witness of the loading, that the bags were properly piled for a seaworthy barge and that the act of piling did not contribute causatively to their subsequent loss.

The appellee's chart shows that the wharf front of the warehouse extended therefrom northerly and then northeasterly and then easterly. The Jupiter's starboard side was so moored to this last mentioned northerly face of the wharf that her stern extended into the bay with her No. 5 hold over the water a few feet easterly of the wharf's northeasterly corner—that is extended from the same side of the wharf as the loading place of the lighter.

The small lighter could have been warped or pulled by hand along the wharf and drawn to the No. 5 hold by the ship's winches or towed there by a small launch. Here, again, in the absence of evidence, we are to infer, under the rule in the New York Barge case, supra, that it re-

quired no other use of the port's facilities than in the movement of the lighter along the wharf.

What happened was that by the time the lighter had been taken to the No. 5 hold of the Jupiter, the lighter's hold began to fill with water through her open seams, leading to her ultimate overturning and submergence.

It is apparent that the lighter was in extremis when she arrived at the No. 5 hold of the Jupiter. The constantly increasing water in her hold made what is known as a "creeping list." As soon as any bags were taken from one side in the lighter's apparent normal discharge and she settled down on the other, the water would pour over to that side. As the seams on that side were submerged deeper, the water pressure increased with increased leaking. So in extremis, the most skillful of stevedores would not be held negligent for the overturning which occurred when but about 100 bags were lifted from her.

To summarize, no negligence is attributable to Crumpacker or any of his assistants in their loading the presumably seaworthy barge. The evidence and lack of witnesses who knew the facts and were charged with the duty to inspect the lighter require the inference that the proximate cause of the loss was the negligent failure to inspect the lighter and discover her unseaworthy condition.

Likewise in such condition of the evidence and lack of witnesses on the proffered excuse of war necessity, that explanation is infected with the grossly negligent failure to inspect the lighter for its Naval use. It certainly would be no defense in a Navy courtmartial to say that "I was so disturbed by a possible Japanese attack that in the 23 days I had to discharge the primary duty of inspecting the few harbor facilities which were to be pressed to the utmost in a war need, I forgot to do so." Yet it is a necessity of Naval warfare which is the only offered defense.

We hold appellee's negligent failure to discharge its obligation as a private carrier warranting the seaworthiness of its vessel makes it liable in damages for the loss of the cocoa beans. Appellants are entitled to an interlocutory decree and a determination of the damages, unless appellee as sovereign has not consented to be sued.

■ The lighter, belonging to the sovereign's Navy, is a "public vessel" within the meaning of the Public Vessels Act, 46 U.S.C.A. § 781 et seq. The cause of the loss is admitted by the appellee's answer to be because "the lighter overturned and a large part of the contents of the lighter (including a large part of the beans referred to in the libel) were lost." That is to say, the loss of the beans was "caused by a public vessel" within § 1 of that Act.

Section 2 of the Public Vessels Act provides that suits under it "shall be subject to * * * provisions of [Suits in Admiralty Act, 46 U.S.C.A. § 741 et seq.] * * * insofar as the same are not inconsistent herewith * * *." Section 2 of the Suits in Admiralty Act, 46 U.S.C.A. § 742,[3] makes provision for the United States' liability both as a common carrier and, as here, a private carrier of such goods as the cocoa beans. Here is a provision for liability to appellants "not inconsistent" with the Public Vessels Act's liability for "damage caused by a public vessel of the United States."

■ In the case of Canadian Aviator v. United States, 65 S.Ct. 639, decided February 26, 1945, it is stated at page 646 that the Public Vessels Act contains the exemptions of the Harter Act, 46 U.S.C.A. §§ 190–195. The Harter Act applies only to the *common carriage of goods* on the carrier's vessels. Koppers Connecticut Coke Co. v. James McWilliams Blue Line, 2 Cir., 89 F. 2d 865. The Public Vessels Act's exemption of the Harter Act would be meaningless if a public vessel's wrongful carriage of goods in her creates no liability in the United States.

At the hearing here appellee argued that the sovereign's permission to be sued for loss of cargo was confined to cargo in other than public vessels. It was contended that the Canadian Aviator case decided no more than that in a non-collision case

---

[3] "Sec. 2. That in cases where if such vessel were privately owned or operated, or if such cargo were privately owned and possessed, a proceeding in admiralty could be maintained at the time of the commencement of the action herein provided for, a libel in personam may be brought against the United States or against such corporation, as the case may be, provided that such vessel is employed as a merchant vessel or is a tug boat operated by such corporation. * * * "

the private owner of a vessel can recover from the United States for the wrongdoing of its public vessel. It is true that such were the facts in that case, but we do not agree that the decision is so narrowed. Its ratio decidendi is in the words of the paragraph next the last [65 S.Ct. 646], " * * * we hold that the Public Vessels Act was intended to impose on the United States the same liability (apart from seizure or arrest under a libel in rem) as is imposed by the admiralty law on the private shipowner, * * *."

Elsewhere in the Canadian Aviator opinion, (65 S.Ct. at page 645) the Court contrasts the Public Vessels Act with the specific limitation of the Wisconsin statute construed in The Osceola, 189 U.S. 158, 23 S.Ct. 483, 47 L.Ed. 760, stating "Moreover, the language in the Wisconsin statute is narrower in scope than that in the Public Vessels Act, 1925, which refers *generally* to 'damages caused by a public vessel.'" (Emphasis supplied.)

The Canadian Aviator case considers the Public Vessels Act in the light of the Suits in Admiralty Act and prior pending bills and concludes that it is not to be construed strictly as in other statutes creating the sovereign's permission to be sued. That Congress contemplated cargo owners as well as ship owners could recover for damages "caused by a public vessel," is apparent from the statement of the committee reporting for the passage of the Public Vessels bills of its "chief purpose." It states that "The chief purpose of this bill is to grant private owners of vessels and of merchandise a right of action when their vessels or goods have been damaged as the result of a collision with any Government owned vessel, though engaged in public service without requiring an application to Congress in each particular instance for the passage of a special enabling act." H.Rep. 913, 68th Cong. 1st Sess. p. 1.

Had the lighter here been negligently towed across the bow of a moving private steamer so that the private steamer had collided with the lighter and caused her, as here, to overturn with the loss of the cocoa beans, the beans would "have been damaged as the result of a collision with * * * [a] Government owned vessel" for which was granted to "the private owners of * * * [the] merchandise a right of action." Such a conclusion does not require the liberal construction of the Canadian Aviator case. Since that case holds that the damage "caused by a public vessel" is not confined to collision, the committee's report is applicable to the negligent use of the unseaworthy lighter here as giving appellants a cause of action against appellee.

This view is further supported by the fact that the sponsors of the bill in both houses stated that it extended to cases where damage was done "by collision or *other* fault of Government vessels and Government *agents*" (emphasis supplied), here the "fault of `* * * Government agents" in failing to inspect the "Government vessel," the unseaworthy lighter.

Jurisdiction in personam over appellee here exists. Appellants are entitled to an interlocutory decree holding appellee liable for the loss of the cocoa beans and a determination of the amount of damages suffered. The decree appealed from is

Reversed.

HEALY, Circuit Judge (dissenting).

The majority opinion proceeds largely on the basis of imported "facts" and extraneous assumptions. It is said, for example, that at the hearing in this court "appellee supplemented its testimony with two frank admissions of fact." One of these supplementary facts (and the only one I will notice) is that the cocoa beans were "desired by the Jupiter's captain as ballast" in the afterhold to bring the vessel's stern down.

This supposed purpose of removing the beans becomes a controlling circumstance in the reversal of the judgment below. The testimony of the officer in charge is disregarded, namely, that he was "directed by competent military authority to clear the customs warehouse space occupied by the cocoa beans and load them into the Jupiter in order that the space they occupied could be used to store provisions under cover." There is nothing in the record, nor yet in the briefs, concerning a desire for ballast. As to the Jupiter's stern, the evidence is that the No. 5 hold was the only one free of the dock and likewise the only one from which cargo had been removed.

The source, if any, from which this important supplemental fact was gleaned must necessarily have been the counsel who argued the case orally. However, this gentleman made no pretense of knowing any facts other than those contained in the

record. He had not participated in the trial, and was sent out to argue the appeal in lieu of counsel who had.[1] In short, he knew no more about the facts of the case than we know ourselves.

Consideration of the matter is approached as though this were an ordinary commercial transaction. It appears to be assumed that the chief preoccupation of the Government was, or rather should have been, to assure the safe transmittal of the cocoa beans to San Francisco. The somber background of an extraordinary case is given little or no attention.

The loss occurred in late January of 1942. It was a time of great stress. The Japanese were swarming over the Pacific like ants through a housewife's pantry, digging themselves in at innumerable strategic places, to be rooted painfully out again at the cost of an infinite quantity of precious blood. A chief necessity of the moment was to keep open the life-line to Australia, across which lay the Samoan Islands. Pago Pago had been shelled on January 11. Resumption of the attack was hourly anticipated, and at the time of the arrival of the convoy it was feared that the Japanese would contest the landing. At the outbreak of the war Samoa had but a handful of military personnel and the place was inadequately defended. The first ships to arrive or depart after December 7 were those of the convoy which reached the Islands on January 20, bringing a huge increase of the military establishment and material for defense.

The picture presented by the record is of a harbor equipped to handle no more than a thousand tons of freight twice a month, now called upon to handle thirty-five thousand tons and do it in the shortest possible time. The work of discharging troops and material began immediately with the utmost haste, and because of the critical military situation the construction of defenses and gun emplacements proceeded simultaneously with the unloading. Marines and native stevedores were working round the clock to unload the convoy and store cargo. About a hundred of these native stevedores had had some previous experience in handling cargo through sideports of the Matson Company ships,

but they were little experienced in the use of winches or the handling of topside cargo. Prior to the convoy's arrival the bush had been beaten for large additional numbers of natives to aid in the work, all of them wholly untrained. But three lighters were available, all of which were in constant use, day and night, in the unloading of vessels anchored in the harbor.

On January 29 Lieutenant Commander Crumpacker was ordered to remove the cocoa beans from the customs warehouse to make room for essential supplies. No other storage space was available except in some of the private dwellings, which were used for storage wherever possible. The rainy season was in progress. In carrying out his orders Crumpacker had planned to transfer the cocoa beans from the warehouse to the Jupiter by daylight whenever the use of one of the lighters might be had. A lighter became available around midnight, at a time when Crumpacker was off duty, apparently getting some much needed sleep. His civilian assistant, who was largely inexperienced, had the stevedores proceed with the job. The capacity of the lighter was a hundred tons, but the stevedores, as the trial court found, overloaded her by at least ten tons so that her top seams shipped water.[2] The bags were piled so high that the boat was unstable, and the uneven removal of the load caused the lighter to rock and water to pour in. According to the Jupiter's log, the lighter came alongside at 1:00 a. m. At 3:15 a.m. (that is to say, two hours and fifteen minutes later) the log notes a decided list of the barge and the sliding of the cocoa beans into the water. In this interval only three hundred bags out of a total of more than sixteen hundred had been gotten on board, which, since the unloading of the barge would normally consume three hours' time, would seem to indicate a decided lack of skill on the part of the stevedores.

The lighter used in the operation, like the two others available in the harbor, was an old wooden vessel built some fifteen to eighteen years before. Had the beans been taken aboard in the daytime rather than in the darkness of night the condition of her upper seams would doubt-

---

[1] On the trial, the case for the Government was handled by Miss Phillips. Her illness, which ultimately proved mortal, prevented her appearance here. Substitute counsel told us that he had hoped to discuss the case with Miss Phillips but that her condition would not permit.

[2] Appellants insist that the lighter was overloaded to the extent of not less than thirty-five tons.

less have been noted and the overloading perhaps avoided. Under the circumstances of the case I think there was no implied warranty of the seaworthiness of the barge. Like the half-trained or wholly untrained native help available, the boat was the best that was to be had.

It was the view of the trial judge that had there been no ship available the Government would have been justified in removing the cocoa beans and leaving them in the rain or dumping them into the sea in order that the essential storage space be obtained; and the fact that an ineffectual effort was made to save the beans does not alter the situation. With this view I agree. Recovery under these circumstances simply amounts to a windfall.