## THE AMERICA.

(District Court, S. D. New York. January 7, 1910.)

SHIPPING (§ 132*)—INJURY TO CARGO—SINKING OF VESSEL.

Seaworthiness of a boat sinking without apparent cause. Where it appeared that the boat was actually seaworthy, the presumption of unseaworthiness from the sinking *held* to be overcome.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 484; Dec. Dig. § 132.*]

(Syllabus by the Judge.)

In Admiralty. Action by the Bush Terminal Company against the steam lighter America for loss of cargo. Decree for libel. Dismissed.

Kneeland & Harison, for libellant.

Foley, Martin & Nelson, for claimant.

ADAMS, District Judge. The Bush Terminal Company claims in its libel that the steam lighter America was under charter to it on or about the 1st day of April, 1906, and while loaded with a cargo of coffee, staves, etc., which had been delivered to the libellant for carriage, she sank at a pier to which she was moored by reason of unseaworthiness. The owner of the coffee has assigned its claim to the libellant, amounting to $2,415.26, and the libellant has become liable on other cargo, to the extent of $1,203.53.

The answer of the claimant admits the charter, the sinking and loss or damage to cargo, and further alleges:

"Eighth: That the said steam lighter was under charter to the libellant herein, and that at the inception of the charter and delivery to the libellant and at all of the times during continuance of the charter of the said vessel by the libellant, the said steam lighter 'America' was in every respect tight, staunch, strong and seaworthy, and properly manned and equipped, and said steam lighter was inspected and kept in good repair and condition at all of the time during the continuance of said charter.

That said vessel, on or about the 31st day of March, 1906, took on board a small cargo of staves and general merchandise, and proceeded to Pier 3, Bush's Stores, Brooklyn, New York, to discharge the same; that by and under the order of an agent or servant of the libellant, the said steam lighter was placed alongside of the north side of Pier 3 at Bush's Stores, and that thereupon the libellant, through its agents and servants started to unload the said vessel; that the said vessel was properly moored, and at all of the time that she lay at said pier was sufficiently manned by competent men.

That while lying alongside of said dock aforesaid, and during the night of April 1, 1906, or in the early morning hours of April 2, 1906, the said lighter sunk at the pier aforesaid; that said sinking was not caused by any unseaworthiness of said vessel, and that the cause of the sinking is unknown to the claimant.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

That the said sinking was not caused by any fault, neglect or want of care on the part of the claimant, or fault, neglect or want of care on the part of the master or the crew of the said steam lighter 'America.' "

The testimony shows that the charter was a verbal one and under its terms the Bush Company was to have charge and custody of the boat at night and the owner, the Commercial Coal Company, was to provide a crew of five men to navigate the boat in the day time.

On the trial the libellant simply proved the sinking of the boat but gave no evidence as to the cause of the sinking.

The claimant gave some evidence as to a scar on the starboard side of the boat tending to show, as it claimed, that the boat had rested on a sunken spile or other obstruction and had thus been caused to list taking in water which caused the sinking. There was however no evidence of the existence of such a spile and the fact that the boat had lain through several tides without injury, disposes of such claim.

The case therefore may be regarded as one of unexplained sinking and it is to be determined whether the vessel is liable under the circumstances of the case. Of course if properly attributable to some defect in the boat which caused the disaster, she is liable.

It appears that the Coal Company heard that the Bush Company desired a boat of the character of this one and a representative of the former saw an agent of the latter with respect to it. He asked if the Bush Company needed a steam lighter and was told that it did. The terms were discussed, the owner asking $1,800 per month, which the Bush Company declined to pay, but a charter was finally effected by which the price was to be $1,500 per month, the crew, to be furnished by the owner, to work 10 hours per day, and the Bush Company to take charge at night and load and discharge her. The latter was to be responsible for her at night if permission were given to work her, the owner's crew of 5 men to be a day crew. The pay of a watchman at night, if away from the Bush Company's wharves, was to be paid by it but it did not consider this necessary when at its own wharves. In order to work the boat night and day a double crew would be required. It was further agreed that the Bush Company should pay for the insurance premiums on the cargoes. The boat was then turned over to the Bush Company upon a trial of 30 days with the provision that if she proved satisfactory, she would be continued for 6 months or more. She was continued in service for the 6 months and was still in service when she sank a month or two thereafter. It was in consideration of the reduction in the amount of the hire that the insurance was to be borne by the Bush Company.

The relations of the parties as to responsibility for loss of cargo, as construed by them, was shown in a transaction where there was a loss amounting to $235, which the Bush Company at first deducted from the hire due but subsequently acknowledged its liability and repaid the amount.

It appears that at the time of the accident a large part of the crew had left the boat, and there remained no one on board to give an account of the sinking but that under the circumstances does not seem to impose any liability on the vessel. It was the duty of the Bush

Company to provide a watchman, if one were necessary. There was one ashore at the place but he evidently did not consider it his duty to care for the boat. She was therefore practically unguarded. The vessel maintained fires on board so that the pumps and boilers could be used if desired but the contract did not require it to keep men on board to utilize the apparatus.

Numerous witnesses testified that the vessel was seaworthy at the time of the loss, giving particulars. She was only about two years old at the time of her first charter and was a good strong boat. She had had a general overhauling just before the charter. Presumably she was seaworthy and this presumption is sustained by credible testimony that she was actually so. She was examined every month and found to be in first class condition. The last examination was only three weeks before the sinking. She had been almost constantly employed in carrying cargoes for the Bush Company. It appears that shortly before the sinking she was not leaking. She carried about 200 tons and only had 40 or 50 tons aboard when she sank. She had been partly unloaded by the Bush Company the day before the sinking and was then and continued to be observed as being in good condition until the afternoon of that day, when she sank.

Something was suggested about the condition of the check valve in the syphons and that the water might have entered the boat in that way but it appeared that it was at least a foot above the water but even if the pipe were submerged, water could not get into the boat through it as there was a check valve to keep the water out and this valve was shown to be in good working order both before and after the sinking.

The boat was pumped out at pier 3, where she sank, and then towed to Jersey City to discharge her cargo and was there found to be absolutely tight. She was examined especially for the purpose of ascertaining the cause of the sinking but without result. Her condition even after what she had been through was good and what damage there was could be properly attributable to the effect of water while she was submerged.

The libellant's case rests altogether upon the presumption that because she sank without apparent cause she was necessarily unseaworthy but it does not seem that such a presumption can be of any force in the face of the controlling evidence that the boat was seaworthy.

In the case of Terry & Tench Company v. Merritt & Chapman D. & W. Co., I applied that doctrine to account for the sinking of a boat being towed in the Hudson River, saying, in opinion delivered from the bench (168 Fed. 533, 536, 93 C. C. A. 613, 616):

"Still this boat sunk without any known cause and the only thing that the Court can do is to resort to such presumption as the law affords to aid it in determining a cause for the accident. The law says if a boat sinks without apparent cause she is to be deemed unseaworthy and I feel forced to come to that conclusion in this case, and I shall dismiss the libel on the ground that the boat was unseaworthy."

On the appeal, however, this decision was reversed. The court of appeals, in an opinion by Judge Noyes, saying (Id., 168 Fed. 534, 93 C. C. A. 614):

"The respondent did show the circumstances of the accident, but offered no evidence to show the cause of the sinking of the vessel, and, to rebut the presumption against it, relied upon the presumption of unseaworthiness arising from the sinking of the vessel without apparent cause. The presumption of unseaworthiness generally arises in insurance cases, where a vessel is in the possession of the insured, and where means of knowledge concerning the condition of the vessel are available to him, rather than to the insurer. But where a vessel is in the exclusive possession of a charterer, means of knowledge are as readily available to him as to the owner, and we perceive no especial reason why there should be any presumption in the matter. We deem it unnecessary to decide this question, however, as we are of the opinion that, if the presumption of unseaworthiness exists in the case, the libellant rebutted it by its proof concerning the condition of the vessel before and after the accident. In our opinion the respondent failed to sustain the burden of proof imposed upon it as a bailee in possession, and the decree was erroneous."

This authority seems to be conclusive of the present case and while the cause of the sinking remains in doubt, in view of the evidence that the boat was actually seaworthy, the presumption must be disregarded.

The libel is dismissed.