**THE WILLIAM ROCKEFELLER.**
**THE MARGARET OLSEN.**
**THE MARIE OLSEN.**
**THE REVERE.**
**THE ARIES.**
**THE VAUGHAN.**
**MORSE DRY DOCK & REPAIR CO. v.**
**STANDARD SHIPPING CO.**
No. A–11933.

District Court, E. D. New York.
Feb. 15, 1932.

Courtland Palmer, of New York City, for libelant.

Kirlin, Campbell, Hickox, Keating & McGrann, of New York City (William H. McGrann and Eugene F. Gilligan, both of New York City, of counsel), for Standard Shipping Co. and the William Rockefeller.

Foley & Martin, of New York City (J. A. Martin, of New York City, of counsel), for Olsen Water & Towing Co.

BYERS, District Judge.

On December 11, 1928, the S. S. William Rockefeller lay bow in, without power, on the south side of Pier 4, in the yards of the libelant, where she was undergoing contract repairs. It was desired to berth her on the north side of Pier 3, in the same yard, to accomplish which the Olsen Water & Towing Company was employed by libelant. Five Olsen tugs were supplied, the captain of one of which boarded the steamer and acted as pilot.

The Rockefeller was hauled into the stream, and turned, so that she might be warped into the new berth, with her stern inshore. While she was being so placed, her stern was brought into contact with Pier 2, and damage was done to the rudder.

The nature, extent and consequences of that damage form the subject of this litigation.

Repairs were made, including the replacement of the upper rudder stock, and the total reasonable value of those repairs is said by the libelant, and admitted by the owner of the Rockefeller, to have been the sum of $10,-185.13.

Under the contract providing for the repairs in process when the vessel was moved, liquidated damages of $1,500.00 per diem were stipulated for each day beyond the period of repair stated in the contract. Delivery of the ship was required on December 14, 1928, under the terms of the contract; it was made on December 20, 1928. The claimant of the ship, upon receiving a bill for the contract repairs, deducted from the amount thereof $9,000.00 or six times the daily liquidated damages, and, in that deduction, the libelant acquiesced. That is to say, on January 2, 1929, the libelant issued a credit memorandum to the owner of the Rockefeller, pursuant to request, for $9,000.00 covering six days' delay in delivery of the ship, and on January 6, 1929, received a check for the amount of its bill for the contract repairs, less this deduction, which check was negotiated, without comment or reservation. No bill was rendered to the Rockefeller, or her owners, for the damage repairs now under consideration.

Over eighteen months thereafter, this libel was filed against the William Rockefeller, and the Standard Shipping Company, its owner; and against the five Olsen tugs and Olsen Water & Towing Company, their owner, in a cause in admiralty, in which the libelant seeks reimbursement for the damage repairs, and the $9,000.00 called demurrage, amounting together to $19,185.13. The vessels were claimed by their respective owners, and the answers filed raise the issues requiring determination. For convenience, the owner of the Rockefeller will be called the Standard, and of the tugs, Olsen. The libelant will be called Morse.

Morse asserts:

A. That the damage repairs were made without prejudice. This is denied by Standard and Olsen.

B. That the $9,000.00 was unlawfully charged by Standard. This is denied by Standard, and Olsen denies knowledge, etc.

C. That the damage repairs were made at the request of Standard; this the latter denies, and Olsen denies knowledge, etc.

D. That, at the survey following the contact, certain surveyors asserted that the major part of the damage was old and not caused thereby. Standard admits this, and Olsen so alleges, and that its responsibility should be confined solely to the results of the contact, and that damage in that behalf did not exceed the sum of $500.00.

It becomes necessary to determine primarily the latter question, namely, the extent of the damage caused by the contact between the steamer and the pier. Decision of this controversy largely turns upon whether Morse was required to replace the upper rudder stock, which was found to be twisted, when the rudder was taken from the ship. The relation between the contact with the pier and the twist in the upper stock rests in deduction, because it was physically impossible for any one to observe the actual torsion of the upper stock while taking place, because that section of the rudder was not exposed to view.

Consideration of the record confirms the impression created at the trial, that the only conclusion to be drawn from the evidence is that the twist in the upper stock has been accounted for in no other way than as the result of the contact between the vessel and the pier. An extended discussion of the testimony would not be helpful, but the reasons which lead to this result may be stated in a few words:

If the twist had antedated the contact, the vessel would have carried a compensating helm, and, if she did, the master and other officers have deliberately committed perjury in testifying to the contrary. Nothing that the court was able to observe would justify such an opinion.

Had such a condition existed, it must have been known to the deck officers, and the surveyor Bull, upon whom Olsen relies in part, explains what adjustments would have been required in the steering apparatus, in such circumstances.

If the upper stock had contained a twist when the contract was made for general repairs, on December 5, 1928, it is clear that provision therein would have been made for this item, for that was done with respect to a sister ship, and it was the upper stock made for the latter, which was installed in the Rockefeller.

The rudder was found to be in alignment, as late as 12 o'clock, noon, on the day of the shifting of the vessel, about two hours before that was undertaken.

The arguments against this view, namely, that an earlier damage to the lower part of the rudder (this can be seen by holding Morse Exhibit 3 horizontally just below the level of vision, with the bottom of the photo nearest the holder) was responsible for the twist, because there was corrosion found in the palms; and that the damage to the pier was so trivial that the contact must have been too light to result seriously, have been examined, and found insufficient to justify a finding other than that herein stated.

■ With reference to the assertion in the libel, that the repairs were made by Morse, without prejudice, it must be said that there is no evidence, verbal or documentary, to that effect. That is, there is nothing in the record to show that Morse proceeded with the repair, reserving its rights to claim compensation therefor. The evidence shows that Hallock, superintendent for Morse, simply undertook to repair the injury, after ascertaining its nature and extent, and, as both Morse and Olsen carried insurance, it is fair to assume that questions of ultimate legal liability were quite subordinate in the minds of the parties, if present at all, to the practical and immediate requirements of the situation.

■ That Morse was obligated to make the repairs occasioned by the striking of the vessel against the pier, seems too plain to require discussion (Pan-American, etc. Co. v. Robins Co. [C. C. A.] 281 F. 97, at page 108). The vessel was in the custody of the yard for the making of general repairs, and clearly the responsibility rested upon the repairing agency so to perform its duties as not to expose the vessel to injury. Having failed in that, Morse was required to repair this damage.

■ If only the obligations of Morse were presented, the question of the reasonable value of these repairs could be disposed of on the pleadings, for Morse alleges, and Standard admits, that $10,185.13 is the correct amount. That, however, is not binding upon Olsen.

■ The third contention of Morse, that the repairs were made at the request of Standard, is perhaps literally true, but not in the legal sense that any obligation to pay for the repairs was thereby assumed. On December 12, 1928, the day following the damage, Standard notified Morse, in writing, of its intention to hold the latter responsible for any and all damages arising out of the accident; and a similar communication, of the following day, repeated the notification, and asserted the intention of claiming the liquidated damages specified in the contract, for delay in delivery beyond the date therein named.

That letter was acknowledged, and assurances were given that all possible attention would be given "to eliminate to the minimum the detention of the vessel."

The making of the repairs by Morse, without assertion of intention to render a bill, or reservation of right of any kind, in face of the two letters referred to from Standard, was consistent with a recognition of legal liability, rather than an intention to make a charge under an implied contract for the work.

■ On December 14, 1928, Morse rendered its bill for the original contract repairs, at the contract price, less certain credit allowances; on December 26, 1928, Standard rendered to Morse a written claim for $9,000.00 liquidated damages for six days' delay in delivery of the vessel beyond the contract date; on January 3, 1929, Morse forwarded its "credit No. 81432" for this amount, specifying the same, and adding: "The above account of rudder damage."

On January 5, 1929, Standard's check to cover the bill, less this credit, was sent to Morse, and negotiated without reservation.

The libel asserts that Standard unlawfully charged Morse the $9,000.00 and deducted it from the sums due the latter, which Standard denies.

The libelant offers no argument in its brief on this subject, nor does the evidence disclose any basis for the claim; if the trans-

action could be considered as one for money paid under a mistake of fact, there might be reason to permit an amendment to assert such a cause, but clearly the documentary evidence renders such an assertion futile. If it was money paid under a mistake of law, it cannot be recovered herein.

■ It is unnecessary at this point to consider whether Morse could have resisted the demand for the credit, had it chosen to do so, because the credit was granted for the precise reason for which it was asked. Counsel for Standard argue that an accord and satisfaction have been shown. It is not necessary to go so far. An accord is arrived at, between those who were previously not so disposed. These parties, as their correspondence and documentary interchanges show, seem to have preserved entire harmony at all times.

The fact that the surveyors acting for sundry underwriters developed a difference of opinion as to whether the twisted rudder stock was new or old damage, and as to the nature of repairs required, was known to both Morse and Standard, but it generated no controversy, nor did it necessarily furnish the basis for controversy. Seemingly it was dismissed by Morse as a mere display of the clash of opinions between experts—not an unheard of thing.

It is concluded therefore that Morse has shown no reason why it should now recover this $9,000.00 from Standard; probably the insistence upon the alleged accord and satisfaction is not entirely unrelated to what has been decided in cases presently to be alluded to, but for the reasons stated it is thought that Morse has precluded itself from pressing this claim against Standard.

■ The same reasoning does not dispose of this aspect of Morse's claim against Olsen. The latter must answer of course to Morse, for negligence in performing the towing operation, to the same extent that Morse was obligated to Standard, i. e., for the reasonable value of the repairs, and demurrage to the extent that the law contemplates, which is a different thing from saying that Morse could liquidate the demurrage claim of Standard, at the sum of $9,000.00, without notice to Olsen, and then collect that sum from Olsen without proof beyond the mere fact of payment.

■ As between Morse and Standard, the latter's claim for liquidated damages required proof with reasonable certainty of the loss of profits accruing to Standard during the six days between December 14, 1928, and December 20, 1928. The Conqueror, 166 U. S. 110, 17 S. Ct. 510, 41 L. Ed. 937; Atchison, T. & S. F. Ry. Co. v. California Sea Products Co. (C. C. A.) 51 F.(2d) 466; The Mary N. Bourke (D. C.) 135 F. 895; The Colombia (D. C.) 197 F. 661.

In the last two cases, the same rule on this subject was applied to repair yards said to have delayed delivery, as to claims based upon collision. In The Colombia, there was a clause in the contract for the payment of demurrage at $100.00 per day beyond the date specified for delivery.

This aspect of the present case has not been the subject of discussion in any of the briefs, and perhaps Morse does not intend to press this claim against Olsen, but the libel is open to such a construction; hence the apparent necessity for discussing the subject.

■ At the close of the trial, the court expressed doubt as to the completeness of the demonstration of necessity for installing a new upper stock, there having been substantial evidence that the old one could have been repaired, by cutting new keyways, and realigning the quadrant of the rudder with the new keyway. Such a repair was feasible; had been done in other vessels, and would have resulted in giving the highest classification to the Rockefeller.

A careful reconsideration of the testimony on the subject, however, yields the view that whatever doubt there is in this aspect of the case is not sufficiently fortified by data, to justify a conclusion that such a repair would have restored the vessel to its owner in the same condition as that in which it was delivered to the repair yard. It would be too serious a responsibility for any court to assume to say, in the state of this record, that the opinion of one surveyor on that subject should be preferred to that of others of equal experience and apparent capacity; or that the opinion of the president of the National Dry Dock & Repair Company, a neutral witness, should be deemed to have been overborne. He said that such a repair is temporary only, and a rudder stock so treated should be replaced by a new one; that the twist itself damages the molecules of the steel, and that this damage cannot be rectified by annealing.

It is therefore concluded that the repair as made was necessary.

The libel against the Rockefeller and her owner will be dismissed, with costs; the libel

against the Olsen tugs and their owner will result in a decree for the libelant, with costs; the Commissioner to be appointed will take proof of damage, i. e., the reasonable value of the repairs made to the Rockefeller arising from the contact with the pier, and such proof as may be offered with respect to the demurrage, if any, that would be properly chargeable, due to loss of profits to the owner of the Rockefeller during the six-day period from December 14, 1928, to December 20, 1928.

Settle decree on five days' notice.

If the foregoing be deemed an insufficient compliance with Admiralty Rule 46½, findings, to include recitals of incorporation and ownership, may be settled on five days' notice.