Robert W. ERLBACHER and Mrs. Mabel Erlbacher, d/b/a Missouri Dry Dock & Repair Company, Appellants,

v.

REPUBLIC HOMES CORPORATION, Appellee.

No. 16050.

United States Court of Appeals Eighth Circuit.

Jan. 26, 1959.

---

Stephen N. Limbaugh, Cape Girardeau, Mo. (Rush H. Limbaugh and Limbaugh & Limbaugh, Cape Girardeau, Mo., were with him on the brief), for appellants.

Paul A. Gaudet, New Orleans, La. (Deutsch, Kerrigan & Stiles, Brunswick G. Deutsch, New Orleans, La., William S. Stone, New Orleans, La., Milton I. Goldstein and Goldstein & Price, St. Louis, Mo., were with him on the brief), for appellee.

Before JOHNSEN, VOGEL and MATTHES, Circuit Judges.

VOGEL, Circuit Judge.

We are concerned here with a suit in admiralty for the loss of a yacht called Mermaid II. Republic Homes Corporation, owner of the yacht, appellee herein, alleged in its libel and complaint by which the action was started that the loss of Mermaid II was due to fire caused by an explosion while the vessel was in the appellants' dry dock for repairs; that such loss was due solely to the negligence and incompetence of the appellants and their employees and agents. Judgment was found for Republic Homes Corporation in the sum of $10,000.00 plus interest and costs.

The testimony indicated the following: In October, 1955, the yacht Mermaid II, while proceeding down the Mississippi River, ran aground near Cape Girardeau, Missouri, and thereby sustained substantial damage. It was towed to the appellants' shipyard at Cape Girardeau, where negotiations were entered into for its repair. In addition to taking care of the damage resulting from the grounding, appellants, at the request of the appellee, made certain other repairs. The yacht was left in the exclusive care and custody of the appellants. All repairs were not completed until December 15, 1955. On December 14, 1955, appellants' yard superintendent reported the imminence of completion to appellee's secretary-treasurer, Warren J. Durkin, and directed attention to the danger of damage by ice if the yacht was left there. Durkin was unable to make the trip and accept the yacht at that time, so it was agreed that a test run and redelivery was to be made after the Christmas holidays. It was understood, however, that because of the danger of ice the appellants would not be responsible for damage caused thereby. A man employed by the appellants was to go on board each day, entailing a labor cost, the amount of which was to be determined later. Appellee agreed to accept delivery of the yacht on January 7, 1956.

On January 5, 1956, appellants' yard foreman boarded Mermaid II to ascertain what cleaning should be done before the yacht was to be delivered to its owner on January 7, 1956. He failed to inspect the engine compartment, although he knew that an open-face radiant electric heater had been placed between the engines to keep them from freezing during cold weather and that that compartment had been closed for an extended time. He sent two laborers aboard to scrub down the decks. One of the laborers heard the sound of a motor running. He saw a stream of water being discharged through a hull fitting leading from the engine compartment in the outboard side of the vessel as she lay moored at appellants' yards. He investigated and found the odor of very strong fumes and noticed liquid spewing in the vicinity of a small motor. Being inexperienced and not knowing what to do, he went ashore and reported to the foreman, who directed him to turn off the electric power, which the appellants had undertaken to furnish from shore. The foreman failed to determine what motor was running or whether the laborer, whom he knew to be inexperienced, was aware of how or where to shut off the power. The laborer returned to the yacht and while looking around in the wheelhouse in an effort to find out where to shut off the power an explosion occurred, followed by fire. As a result Mermaid II became a total loss.

After holding that jurisdiction existed by virtue of 28 U.S.C.A. § 1333, the trial court concluded:

2. At the time of loss the Mermaid II was in the exclusive custody and control of respondents. It is well settled that owners of a shipyard who take a vessel into their custody and control are bailees. As such, the loss of the yacht while in respondents' custody and control raised a presumption of negligence on their part.

3. Respondents offered no proof to indicate that anything other than their own negligence led to the explosion, and the resulting loss, of Mermaid II.

4. The loss of Mermaid II was caused by the negligence of respondents.

Appellants' primary contention on the question of liability is to the effect that after the completion of the repairs the character of the original bailment changed and appellants thereupon became gratuitous bailees. In support of such contention, appellants cite cases involving gratuitous bailments, such as the leaving of valuables with a hotel after having paid for lodgings and having checked out. There being no compensation to the bailee, the rule that the hotel would be required to respond only for any loss in event it acted without good faith or the loss occurred through gross negligence on its part was applicable. Such cases are not appropos

here. The court specifically found on substantial testimony that the repairs were completed in mid-December, 1955, but that the appellee agreed to accept delivery after the Christmas holidays and that in the interim the appellants agreed that they would continue to care for the yacht, excepting that they would not be responsible for damage caused by ice in the river. Durkin testified:

"That it was there and they would take care of it until we got there, that the repairs were finished and they would take care of it until we got there. With reference to charges for the care of the vessel during that time, Mr. Connolley stated that to put a man on board every day would entail a labor cost. The statement was that we would worry about that when the time came. I agreed to accept delivery of the yacht the 7th of January."

The appellants, having taken Mermaid II into their exclusive care and custody, became bailees. While the evidence may be somewhat conflicting, the court's determination that the appellants would continue to care for the yacht until it was called for after the Christmas holidays and that the bailment therefore continued, excepting that the appellants would not be responsible for damage caused by ice in the river, is based upon substantial testimony and must be accepted here. Higgins v. Kitterman, 8 Cir., 1958, 257 F.2d 861; Wilson v. New York Life Insurance Co., 8 Cir., 1958, 250 F.2d 649. That evidence indicated that at the time of the explosion the appellants had equipment aboard the yacht. They sent an employee on board daily to inspect. A charge was to be made therefor. Two of their laborers were actually engaged in cleaning up the yacht at the time of the explosion. We think that there can be no doubt but what the relationship of bailor and bailee for their mutual benefit, which began in October, continued and was in existence at the time of the explosion.

Under these circumstances, the rule governing the liability of the bailee would appear to be clear. Excepting as to damage caused by ice, which was specifically excluded, the bailment created a duty on the part of the appellants to exercise due care to see that the yacht be not damaged or destroyed. The burden of establishing negligence on the part of the bailee was, of course, on the bailor and that burden did not change through the trial. Proof that the yacht was delivered to the bailee in good condition and was damaged while in the exclusive possession and control of the bailee, however, established a presumption of negligence. Thereafter it became necessary, if the bailee would overcome that presumption, to go forward with the evidence and show that due care was exercised. Judge Learned Hand, in Alpine Forwarding Co. v. Pennsylvania R. Co., 2 Cir., 1932, 60 F.2d 734, 736, stated the rule thusly:

"The bailor, upon proving the bailment and injury, is entitled to the benefit of a presumption of fault which the bailee must meet by showing, either how the barge was injured, or that however that was, it was not due to his neglect. Cummings v. Pennsylvania R. Co., 2 Cir., 45 F.2d 152; Schoonmaker Conners Co. v. Lambert Transp. Co., 2 Cir., 268 F. 102."

Mr. Chief Justice Stone, speaking for the Supreme Court in Commercial Molasses Corp. v. New York Tank Barge Corp., 1941, 314 U.S. 104, 111, 62 S.Ct. 156, 161, 86 L.Ed. 89, explained the reason for the rule as follows:

"Since the bailee in general is in a better position than the bailor to know the cause of the loss and to show that it was one not involving the bailee's liability, the law lays on him the duty to come forward with the information available to him. The Northern Belle, 9 Wall. 526, 529, 19 L.Ed. 746; Gulf, C. & S. F. Ry. Co. v. Ellis, 8 Cir., 54 F. 481, 483; Pacific Coast S. S. Co. v. Bancroft-Whitney Co., 9 Cir., 94 F. 180; The Nordhvalen, supra, [D.C., 6 F. 2d 883] 886. If the bailee fails, it

leaves the trier of fact free to draw an inference unfavorable to him upon the bailor's establishing the unexplained failure to deliver the goods safely. Southern Ry. Co. v. Prescott [240 U.S. 632, 36 S.Ct. 469, 60 L.Ed. 836], supra; cf. The America, D.C., 174 F. 724."

In Stegemann v. Miami Beach Boat Slips, 5 Cir., 1954, 213 F.2d 561, 564, the court very well stated the rule as follows:

"When a vessel is placed at a wharf or dock for storage and/or repairs, a bailment results for the mutual benefit of the owner of the vessel and the operator of the wharf or dock. Orrell v. Wilmington Iron Works, Inc., 4 Cir., 1950, 185 F.2d 181; Pan-American Petroleum Transp. Co. v. Robins Dry Dock & Repair Co., 2 Cir., 281 F. 97; Knecht v. Castleman River R. Co., D.C., 25 F.Supp. 650; The Gladys, D.C., 49 F.Supp. 780. Unless stipulated otherwise, such a bailment imposes upon the bailee the duty of ordinary care. See authorities cited, and The William Rockefeller, D.C., 57 F.2d 897; Commercial Molasses Corp. v. New York Tank Barge Corp., 314 U.S. 104, 62 S.Ct. 156, 86 L.Ed. 89; Lake Union Dry Dock & Machine Works v. United States, 9 Cir., 79 F.2d 802.

"The burden of proof of negligence is on the bailor, but by proving that the vessel was delivered to the bailee in good condition and damaged while in his possession, the bailor makes out a prima facie case of negligence; and the duty then devolves upon the bailee to go forward with the evidence and show affirmatively that he exercised ordinary care. See authorities cited, and Southern Ry. Co. v. Prescott, 240 U.S. 632, 36 S.Ct. 469, 60 L.Ed. 836."

In Richmond Sand & Gravel Corp. v. Tidewater Const. Corp., 4 Cir., 1948, 170 F.2d 392, 393–394, the court stated:

"There are, in general, two ways in which the bailee may rebut the presumption. He may show either how the disaster in fact occurred and that this was in no way attributable to his negligence, or that he exercised the requisite care in all that he did with respect to the bailed article so that, regardless of how the accident in fact transpired, it could not have been caused by any negligence on his part. The Dupont, D.C., 14 F.Supp. 193; see Banks v. Chas. Kurz Co., D.C., 69 F.Supp. 1017, 1018. The presumption is not evidence for the consideration of the jury, see Alpine Forwarding Co. v. Pennsylvania R. Co., supra, 60 F.2d at page 736, and once rebutted in either of these fashions, disappears from the case. Waldie v. Steers Sand & Gravel Corporation, 2 Cir., 151 F.2d 129. It is thus solely a procedural device and does not in any way affect the ultimate burden of proving the bailee's negligence, which burden remains throughout with the plaintiff-bailor. Commercial Molasses Corporation v. New York Tank Barge Corporation, supra; Seaboard Sand & Gravel Corporation v. American Stevedores, 2 Cir., 151 F.2d 846; The Dupont, supra."

We think here that, as held by the trial court, the circumstances fully justified a presumption of negligence on the part of the appellants and that the appellants completely failed to overcome that presumption, which alone was sufficient to sustain the court's finding of liability.

Independent of the presumption of negligence where a bailee fails to return the subject of the bailment in the same condition existing at the commencement of the relationship, we think here the court was additionally justified in finding that the loss of Mermaid II was caused by the negligence of the appellants. Without burdening this opinion with all of the details of the evidence, attention is directed to the fact that the

appellants' yard undertook to furnish electric power to the yacht from the yard's shore line; that they hooked up two electric heaters on the yacht, one being placed in the engine compartment; that the foreman, when he inspected the yacht on the morning of the casualty, failed to inspect the engine compartment, although he knew the electric heater was there and that the compartment had been closed for an extended time. He did not know whether the heater was running. When an inexperienced yard laborer reported to him that a motor was in operation in the engine compartment, that it was spewing liquid and that there were strong fumes, he admitted that, "It did strike me at the time as being a dangerous situation, absolutely it did." Instead of doing something himself, he sent the inexperienced laborer, who wasted time trying to find out how to shut off the power. We think the evidence taken as a whole justified the conclusion of the trial court that there was active negligence on the part of the appellants which was a proximate cause of the explosion and loss.

 Appellants seek to predicate error upon the overruling of various motions to strike testimony. Durkin, the secretary-treasurer of the appellee, testified that:

"The condition of the gas and fuel lines aboard the vessel was the same as their condition when it was purchased. Was good."

Appellants moved to strike on the grounds that these were mere conclusions and had no probative value. As an officer of the corporate owner and one of those who had negotiated the purchase of the yacht and who had operated it and was familiar with it, the witness was entitled to express his opinion. There was no error in the ruling. The same witness was allowed to testify that before purchasing the yacht, Mermaid II, " * * * we looked at a number of other yachts. Yes, sir, we priced those other yachts—probably thirty or forty. We looked at them every chance that we got," and that he thought he made a good buy. The fact that Durkin may have based his estimate of the value of the yacht through having examined thirty or forty other yachts and pricing them went to the weight, not the admissibility of his testimony. The weight of his testimony was a matter for the trier of the facts.

Objection was made to the testimony of Joseph V. Holzmann, a Marine Surveyor on the staff of Neare-Gibbs and Company, general agents in the river insurance business. Holzmann had made a survey of Mermaid II in 1951. He was asked the question:

"Assuming that the Mermaid was —that the Mermaid II was in approximately the same general condition as of January, 1956, except for ordinary wear and tear, since you made your survey in 1951, will you give us your opinion as to her fair market value as of January, 1956?

"A. If the vessel was well maintained during the period 1951 to 1956, I would say that the market value in 1956 would be still about $12,000.00."

Here, again, the question was solely one of weight, not admissibility and there was no error in the ruling of the trial court.

Testimony with reference to the market value of Mermaid II was contradictory. The court found the value at $10,-000.00. Substantial testimony in the record supports that conclusion. We have examined each point to which our attention has been directed and find no error in the record. The judgment appealed from is affirmed.