344 F.Supp. 1391 (1972)
MISSOURI PORTLAND CEMENT COMPANY, a corporation, Plaintiff,
v.
UNIVERSAL TOWING COMPANY, a corporation, Defendant and Third-Party Plaintiff,
v.
WALKER TOWING COMPANY, a corporation, Third-Party Defendant.
No. 71 A 659(3).
United States District Court, E. D. Missouri, E. D.
June 23, 1972.
*1392 Lewis, Rice, Tucker, Allen & Chubb, St. Louis, Mo., for plaintiff.
D. Sherman Cox, St. Louis, Mo., for Universal Towing Co.
Goldstein & Price and Gary T. Sacks, St. Louis, Mo., for Walker Towing Co.

MEMORANDUM OPINION
WEBSTER, District Judge.
This is a case of admiralty and maritime jurisdiction and is an admiralty claim within the meaning of Rule 9(h), Federal Rules of Civil Procedure. Plaintiff Missouri Portland Cement Company ("Missouri Portland") seeks to recover against defendant Universal Towing Company ("Universal") for damages sustained to plaintiff's barge while in the bailment custody of defendant. Defendant third party plaintiff seeks indemnity against third party defendant Walker Towing Company ("Walker"). Walker has counterclaimed against Universal for damages to its motor vessel "Mister Charlie Walker" arising out of the same incident.

Facts
All parties are and were, on May 15, 1972, corporations organized and existing according to law. Universal maintained and operated at all times material to this suit a fleeting facility at Mile 175 in St. Louis Harbor on the Missouri shore of the Mississippi River.
Plaintiff's cement barge MPC-63 was moored at defendant's main fleet station at Mile 175 from May 12, 1971 to May 15, 1971. On May 14 and 15, 1971 Universal had stationed along the shore three permanent fleet barges 285 feet long and 47 feet wide, with the work barge Cora moored aft of the third fleet barge. Shortly after midnight on May 15, 1971, there were seven barges outboard of the first (northern most) fleet barge, four barges outboard of the second fleet barge and two barges outboard of the third fleet barge. There were, in addition, three more tiers of three barges each below the third fleet barge.
From 4 P.M. May 14, 1971 until 2:45 A.M. May 15, 1971, Universal made a substantial number of changes in the fleet configuration. Barges were added, removed and relocated.
When Eugene Maynard, pilot of defendant's tow board Husky came on board for duty at midnight, May 17, 1971, his night orders directed him to arrange a flat surface along the fleet to receive the tow of Walker's "Charlie Walker". At 2:45 A.M. there were four tiers with three barges moored outboard of each fleet barge and two barges moored outboard of the work barge Cora. MPC-63 was the outboard barge in the third tier (counting north to south), facing upstream (north).
There is a bend in the river at Mile 175 with the result that the fleet barges took a concave shape. There was a space of approximately 100 feet between the second and third tier, with the Cora close in to the third tier. An eddy or up and down surging of the water is normally present at Mile 175. In the early hours of May 15, 1971, the current had a hard set toward the Missouri shore. Captain Maynard stationed himself about 100 feet south of the Cora to assist the Charlie Walker as needed. By radio telephone Maynard called relief captain William Claxton of the Charlie Walker as it approached coming abreast of the main fleet and informed him of the hard set. The shape of the Charlie Walker tow was five barges long and three wide. The average barge was 195 feet × 135 feet, resulting in a tow length of 975 feet to 1,000 feet in length. Charlie Walker itself was 156 feet long and 36 feet wide. The barges contained a cargo of coal with an approximate draft of 8½ to 9 feet with freeboard of 1½ to 2 feet. The rakes (or prow) of the forward barges were up (or forward) as the tow approached the fleet from downstream and the rakes were down on the face barges immediately forward of the Charlie Walker.
Captain Claxton piloted his tow toward Universal's fleet in a position or *1393 shape parallel with the set of the current so that the stern of his tow was closest to the fleet as he made his approach. As he came abreast of the fleet, Captain Claxton knocked out his headway and was travelling at approximately 1 mile per hour, with power. When the tow was approximately 35 feet off the fleet, Claxton brought the stern of his tow in contact with the fleet. The port facing barge of his tow touched the MPC-63 with the knuckle of its rake. Claxton thereupon brought the stern of the tow out toward midstream. At the same time, MPC-63, the next inboard barge MAT-23 and the next inboard barge MBL-571 began to drift aft and top around as a unit. At approximately 2:45 A.M. the starboard side of the MPC-63's rake and the port tow knee touched the Walker amidships. The barges drifted downstream and were recovered by the Husky and two other assisting tugs some time later.[1]
Richard B. Yeomans inspected the barges and the Charlie Walker for damage on May 15, 1971. He found that the MPS-63 had a draft of 7'5" at the box and 8' at the stern, with about 4 feet of freeboard. It had received damage on the starboard side in three locations: 1) at the number 3 wing tank, 2) at the number 2 wing tank and 3) at the number 1 wing tank. He noted that the starboard rake knuckle of the barge was damaged 25 feet forward from the damage on the number 1 wing tank and a little lower, and that the port tow knee was also damaged. From the evidence, the court finds that the port tow knee touched the Walker amidships during the topping out operation. Parties have stipulated as to damages and the findings of the inspector are material only as evidence of the manner and extent of impact.
There was testimony that Universal normally used a 7/8 " wire rope for its fleet mooring operations. There was also testimony, however, that Universal would, on occasion, use the mooring lines or wires which were found on the barges brought in for mooring. The court finds from the credible evidence that the damage to the starboard side of the MPC-63 was caused when the port stern facing barge in the Charlie Walker tow made first contact with defendant's fleet, specifically the MPC-63. While Captain Claxton testified that it was an "eggshell landing", the physical damage does not support this testimony. The court further finds that Captain Claxton should have known that the knuckle of his port facing barge could cause damage to the mooring barge if a stern barge landing should take place with excessive impact. Considering the eddy present at all stages of the river in this location, the hard set of the current and the potential for damage, the court finds that Captain Claxton's choice of landing procedure and his implementation of that procedure in all the circumstances was contrary to the exercise of ordinary care and that the resulting damage to the starboard side of the MPC-63 was in part occasioned by the negligence of the defendant.
As operator of the fleet, defendant had a responsibility not knowingly to permit barges entrusted to its care to be damaged by third persons using the fleet facility. The pilot of defendant's assisting vessel "Husky" remained at a standby station 100 feet below the lowest barge in the fleet. It was not defendant's practice to use its vessels to assist towing vessels in landing their tows, and no offer was made in this instance. The pilot was, however, in a position to observe the entire approach, and, in fact, noted that the Charlie Walker was making its approach parallel to the current with the stern of the tow the closest point of the tow in *1394 reference to the fleet. As a bailee for hire, defendant knew or should have known that if the tow were permitted to come alongside the moored barges in this fashion, there was danger that the outboard barges would be damaged by the rake of the port-facing barge. The court finds that the defendant was negligent by failing to instruct the Charlie Walker to make a bow landing or in not offering its assistance to the Charlie Walker if the Charlie Walker could not otherwise make a bow landing.
The court is not in a position to find that the contact with the Charlie Walker, from all the facts in evidence, was the procuring cause of the barges coming adrift and the MPC's subsequent coming into contact with the Charlie Walker to their mutual damage. No competent evidence was offered to explain how or why the three barges, including the MPC-63, came adrift. While the original impact was sufficient to cause damage, the court cannot find from the credible evidence that this impact was sufficient to break the lines. Since the three barges broke loose as a unit, the lines from the MBL-571 to the fleet barge must have failed in some way.

Conclusions of Law
This court has jurisdiction of this action pursuant to Title 28, United States Code § 1333.
The damage to barge MPC-63 occurred while the vessel was in the care and custody of defendant Universal Towing Company as bailee. As such, the damage to the barge while in the custody and control of defendant raised a presumption of negligence on the part of defendant. Erlbacher v. Republic Homes Corporation, 263 F.2d 217 (8th Cir. 1959).
Defendant failed to rebut this presumption by convincing evidence showing either that the incident and resulting damage were in no way attributable to its negligence, or that it exercised the requisite care in all that it did with respect to the barge so that, regardless of how the accident in fact transpired, it could not have been caused by any negligence on its part. Richmond Sand & Gravel Corp. v. Tidewater Const. Corp., 170 F.2d 392, 393-394 (4th Cir. 1948); Erlbacher v. Republic Homes Corporation, supra, 263 F.2d at p. 221; Edward G. Murray L. & T. Co. v. Pennsylvania R.R., 130 F.2d 199 (2d Cir. 1942).
In addition to damage to its starboard side, the MPC-63 incurred damage on the rake and port tow knee. Defendant not having exculpated itself, it must be held liable to plaintiff for the full amount of the stipulated damage to plaintiff, which is $4,000.00.
We turn now to the third party complaint and counterclaim. The plaintiff has filed no crossclaim against the third party defendant, nor has defendant tendered the third party defendant to plaintiff. The defendant seeks in its third party complaint to be indemnified against any judgment obtained by plaintiff on account of the accident. In admiralty, when two parties are found to be negligent in connection with a claim of damage, each is liable for fifty per cent of the total resulting damage. The court having found that portion of the damage was caused by the negligence of third party defendant Walker, the defendant is entitled to recover fifty per cent of the amount for which it is held to be liable to Missouri Portland Cement Company. The damage to Charlie Walker, which occurred when the barges topped out as a result of defendant's negligence, must be shared by Walker and Universal. That amount was stipulated to be $1,000.00.
In conclusion, the court will award damages in favor of plaintiff Missouri Portland and against defendant Universal in the amount of $4,000.00. The court will award defendant third party plaintiff Universal $2,000.00 on its claim against third party defendant Walker and will award Walker Towing Company $500.00 on its counterclaim against third party plaintiff, for a net award to defendant *1395 third party plaintiff of $1,500.00.
The foregoing constitutes the court's findings of fact and conclusions of law. Judgment will be entered accordingly.
So ordered.
NOTES
[1] There is substantial conflict in the testimony as to whether the Charlie Walker moved the stern of the tow out toward mid-stream or was pushed outstream by the topping barges. After hearing the testimony and examining the dimensions and space involved for such maneuvering, the court is convinced that the topping followed maneuvers by the Charlie Walker to straighten its tow before the set of the current could interfere with the completion of its landing operation.