**MISSOURI PORTLAND CEMENT COMPANY, Plaintiff,**

**v.**

**WALKER BARGE FLEETING SERVICE, INC., Walker Midstream Fuel & Service Co, Defendants.**

**Civ. A. No. 78–0106–P.**

United States District Court,
W.D. Kentucky,
Paducah Division.

March 31, 1982.

Andrew Rothschild and James W. Herron, Lewis, Rice, Tucker, Allen & Chubb, St. Louis, Mo., Francis T. Goheen, Paducah, Ky., for plaintiff.

W. Pelham McMurry and M. Greg Rains, McMurry & Livingston, Paducah, Ky., for Walker Barge Fleeting Service.

Elmer Price, Goldstein & Price, St. Louis, Mo., Henry O. Whitlow, Whitlow, Roberts, Houston & Russell, Paducah, Ky., for Walker Midstream Fuel & Service Co.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

JOHNSTONE, District Judge.

In this admiralty suit the Missouri Portland Cement Company seeks damages from Walker Barge Fleeting Service Company and Walker Midstream Fuel Service Company incurred due to the sinking of its cement transport barge, the MPC–9. The MPC–9 capsized while in the Walker Barge fleeting area on the Tennessee River near Paducah, Kentucky. Walker Barge and Walker Midstream have each filed a cross-claim against the other. This Court has jurisdiction of this action under the provisions of 28 U.S.C. § 1333. The claims of the parties are within the scope of Fed.R. Civ.P. 9(h).

The MPC–9 was loaded with 1293.9 tons of dry cement at the Missouri Portland loading dock on the Ohio River near Joppa, Illinois, on August 23, 1977. The barge was towed to the Paducah area, and finally moved to the Walker Barge fleet site by the Walker Midstream's M/V William Eric. The movements of the barge, to this time, were without incident.

Early on the morning of August 27, the M/V Knox, also a Walker Midstream vessel, rearranged the barges for a tow of the M/V Imogene Igert. The rearrangement included moving another barge, the BR–1, upstream and alongside of the port side of the MPC–9. Upon completion of the maneuver, the Knox left to attend other business. Less than one hour later the MPC–9 was observed to be listing hard to port, and a portion of its deck was soon awash. All attempts to rescue the distressed barge failed, and she sank quickly in calm waters. The barge ultimately was salvaged and repaired. By June, 1978, the barge had returned to service and, at the time of trial, she had made some 35 more trips.

The Court must determine whether the sinking was a result of the alleged unseaworthy condition of the MPC–9 or whether it was a result of the alleged negligent

maneuvering of the BR–1 by the M/V Knox. Although there was testimony from witnesses present during the maneuver of the BR–1 alongside the MPC–9, the focus of the proof was upon the physical evidence regarding the barge, both before and after the sinking. A detailed statement of findings based on that evidence follows.

At the time of her sinking the MPC–9 was 26 years old. Both the bow and stern rakes of the barge had been "foamed" in lieu of replating. Hatch covers were either non-existent or incapable of providing watertight protection, due to missing "dogs" or cement encrusted recesses. The door from the deck to the machinery room was not watertight. The plating of the barge was seriously worn and deteriorated. Weep holes and fractures were evident. The hull had a "washboard" appearance, caused by indentation of the hull along the barge's structural ribs. The presence of these various indicia of use and old age are not disputed by the parties. The barge had not been in dry dock for repair or maintenance for two years prior to the accident.

The Court finds that the MPC–9 began to take on water soon after a hole was torn into her number two port wing tank as the M/V Knox brought the BR–1 alongside. The hole was about 12″ in length and 2″ in width. A bent interior rib, filed as an exhibit, indicates that there was contact, at an excessive angle and with unreasonable force, between the two barges. Thus, the Court finds that damage to the MPC–9 was partially caused by the failure of the M/V Knox to use ordinary care in maneuvering the BR–1.

However the maneuvering of the BR–1 by the Knox cannot be seen as the sole cause of plaintiff's loss. The washboard effect of the hull had created a condition such that, instead of sliding smoothly along the MPC–9's port side, the BR–1 gouged into the plating, which was 40 to 60% wasted, and caught a structural rib. There was testimony, and this Court finds, that 25% wastage of plating is the maximum generally acceptable under industry standards. Plaintiff's expert testified that, judging from the interior rib, thicker plating could have been torn in such an accident. Nevertheless, the Court finds that the combination of wasted plating and the "washboarding" worked to render the barge unreasonably vulnerable to damage.

When water began to flood into the wing tank, the presence of, what was in effect, a centerline bulkhead accelerated the sinking of the barge. The water was confined to a single compartment and produced a hard port list. Absent this bulkhead, the water would have filled the port and starboard hatches evenly, and the sudden list would not have occurred. After the list, water poured through the defective hatches and the pump room door.

■ We therefore find the damage to the MPC–9 was caused by the combination of the failure of the M/V Knox to exercise ordinary care during the maneuver of the BR–1 and the failure of the plaintiff to maintain the MPC–9 in a seaworthy condition. Having reached this result as to causation, it is proper to allocate damages based upon the comparative fault of the parties. *United States v. Reliable Transfer Co.,* 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975). *Cf., Mulzer v. J.A. Jones Construction Co.,* 397 F.2d 498 (7th Cir.1968).

The Court concludes that the negligence of the plaintiff in allowing the MPC–9 to fall into such a state of unseaworthiness was responsible for the greatest portion of the loss suffered. Accordingly, 80% of the liability is apportioned to Missouri Portland.

■ Having determined that part of the loss is allocable to the defendants, it is necessary to determine how liability should fall as between them. Plaintiff seeks damages on principles of bailment and collision. The damage to the MPC–9 came while she was in the Walker Barge fleeting area, and it is well settled that a fleeting operation creates a bailment situation. *See, e.g., United Barge Company v. Notre Dame Fleeting & Towing,* 568 F.2d 599 (8th Cir. 1978); *Dow Chemical Co. v. Barge UM–23B,* 424 F.2d 307 (5th Cir.1970); *John I. Hay Co. v. The Allen B. Wood,* 121 F.Supp.

704 (E.D.La.1954). Walker Barge has admitted its status as bailee; Midstream contends that it, Midstream, did not occupy such a position but instead acted "only to move barges from one part of the harbor to another."

The fleeting area, where the barge movement occurred, was licensed by Walker Midstream to Walker Barge. It was Barge which paid the landowners for the mooring rights, held the permits from the Corps of Engineers, and charged $12 per day for fleeting. However, since Walker Barge did not have personnel or equipment with which to function as a fleeter, it purchased the services of Walker Midstream in operating the fleet sites. Barge looked to Midstream to tend the fleet sites, rearrange barges when river conditions and other elements might interfere with the fleeting of barges, perform pumping services, maintain wires, and to generally maintain the fleeting operation. Walker Midstream, in effect, acted as the fleeter in the stead of Walker Barge to tend properly to barges in the fleeting area.

The damage to the MPC–9 occurred when the M/V Knox, a Walker Midstream vessel, was rearranging barges within the Walker Barge fleet for a tow of the M/V Imogene Igert. The charge for this type operation benefited only Midstream, and this was not one of the services Midstream had agreed to provide on behalf of Barge as bailee.

■ Accordingly, the Court finds the negligent act of Midstream in allowing the BR–1 to collide with the MPC–9 in such a way as to contribute to the damage done to plaintiff's barge was in breach of a duty owed by Midstream while acting independently, and not while acting on behalf of Barge as bailee. Although Barge was under a duty to exercise reasonable care with the vessels it fleeted, it was not an insurer of their safety and the Court cannot say that any duty of care owed by Barge was breached by the acts of Midstream. *United Barge Company v. Notre Dame Fleeting & Towing, Dow Chemical Co. v. Barge UM–23B, supra; Missouri Portland Cement Co. v. Universal Towing,* 344 F.Supp. 1391 (E.D.

Mo.1972); *John I. Hay Co. v. The Allen B. Wood, supra.*

Plaintiff has established the negligence of Midstream regardless of any evidentiary presumption, whether it relates to bailees or matters of collision, *see, e.g., Pacific Towboat Co. v. States Marine Corp. of Delaware,* 276 F.2d 745 (9th Cir.1960); *Richmond Sand & Gravel Corp. v. Tidewater Const. Corp.,* 170 F.2d 392 (4th Cir.1948). Accordingly, Walker Midstream, solely, must bear the loss not apportioned to Missouri Portland.

■ Walker Midstream argued that any liability placed upon it should ultimately be borne by Barge under the concept of piercing the corporate veil, and there was evidence adduced at trial concerning the close connection between the two corporations. Yet, the test is that " . . . the corporate entity is disregarded only where control of the fictive corporate person achieves a result which could not otherwise have been achieved." *Poyner v. Lear Siegler, Inc.,* 542 F.2d 955, 959 (6th Cir.1976). In this matter, there has been no indication that either Barge or Midstream dominates the other. The Court finds no grounds for shifting liability back to Barge under this theory in this matter.

In considering the appropriate measure of damages the Court is guided by the following:

"Restitutio in integrum" is the precept in fixing damages, and "where repairs are practicable the general rule followed by the admiralty courts in such cases is that the damages assessed against the respondent shall be sufficient to restore the injured vessel to the condition in which she was at the time the collision occurred; . . ." *The Baltimore,* 8 Wall. 377, 75 U.S. 377, 385, 19 L.Ed. 463 (1869).

The workable guides to this end, generally stated, are these. If the ship sinks and is beyond recovery, the damages are her value just before she sank, plus interest thereon until payment. If she is not a complete loss and repossession or repairs are both physically and economically fea-

sible then the reasonable cost of recovery, including repairs and an allowance for deprivation of use, is the measure. But if the reclamation expenses including repairs are not both physically and economically practicable, then it is a constructive total loss, and the limit of compensation is the value plus interest. *O'Brien Bros. v. The Helen B. Moran,* 160 F.2d 502 (2d Cir.1947).

*Hewlett v. Barge Bertie, In Re Evelyn,* 418 F.2d 654, 657 (4th Cir.1969).

Defendants claim that the salvage costs incurred are unreasonable largely because an alternative, less expensive method for raising the MPC–9 was submitted to plaintiff shortly after the barge sank. However, plaintiff had been requested by the Corps of Engineers to remove the barge, and the Court believes that the owner would have good reason to want the barge removed as soon as practicable. *See, e.g., Tennessee Valley Sand & Gravel Co. v. M/V Delta,* 598 F.2d 930 (5th Cir.1979). Plaintiff requested bids for the salvage operation and awarded the salvage contract to Valley Line Supply and Equipment Company as low bidder. From the evidence presented at the trial it is apparent that the alternative referred to came after the bid of Valley Line had been accepted and shortly before that company was to begin its salvage operation.

The burden to prove that plaintiff failed to mitigate damages was upon the defendants. *Tennessee Valley, supra.* Here, that burden has not been sustained and thus the Court finds that the salvage costs of $133,000 incurred by plaintiff were reasonable.

Plaintiff expended $178,577.61 in repairing the MPC–9. It is argued that since such a sum exceeds the value of the barge, liability is limited to the latter amount. No substantial evidence was introduced as to the value of the barge prior to its sinking. It was proved that $3,000 was offered for her after she sank, and that she was insured for $95,000.

The Court, judging from other indicia of value, is of the opinion that the repairs made here were economically feasible. Evidence was presented as to plaintiff's need for this barge in the upcoming season, the lack of a market in such specialized vessels, and its inability to locate a replacement barge, whether on a rental or purchase basis. The Court finds that the use value of the barge to the plaintiff justified its expending the amount it did. *See Hewlett v. Barge Bertie, supra.*

Marine Loss Control, Inc. was retained by plaintiff as marine surveyors after the casualty. The reasonableness of the fee charged, $5,992.50, has not been seriously contested.

The parties stipulated the value of the cargo of dry cement to be $44,500, which the Court now adopts.

The total proven damages are $362,-070.11. Since 80% of these damages are apportioned to Missouri Portland Cement, the remainder 20%, or $72,414.02, must be awarded against Walker Midstream. To this amount pre-judgment interest at the rate of ten (10%) percent per annum, to be calculated from the date of the accident, is to be added. *Federal Barge Lines, Inc. v. Republic Marine, Inc.,* 616 F.2d 372 (8th Cir.1980).